293 N.J. Super. 421 (1996)
681 A.2d 105
C.P., AN INFANT, BY HER GUARDIAN AD LITEM, J.P., INDIVIDUALLY, AND E.P., INDIVIDUALLY, PLAINTIFFS-APPELLANTS,
v.
TOWNSHIP OF PISCATAWAY BOARD OF EDUCATION, DEFENDANT-RESPONDENT, AND JOSEPH CARABILLO, GRANT AVENUE COMMUNITY CENTER, INC., AMERICAN RED CROSS, JOHN DOES 1-20, DEFENDANTS. C.P., AN INFANT, BY HER GUARDIAN AD LITEM, J.P., INDIVIDUALLY, AND E.P., INDIVIDUALLY, PLAINTIFFS-RESPONDENTS,
v.
JOSEPH CARABILLO, DEFENDANT-APPELLANT, AND TOWNSHIP OF PISCATAWAY BOARD OF EDUCATION, GRANT AVENUE COMMUNITY CENTER, INC., AMERICAN RED CROSS, JOHN DOES 1-20, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued and Submitted May 29, 1996.
Decided August 15, 1996.
*424 Before Judges DREIER, ARNOLD M. STEIN and CUFF.
Donald J. Sears argued the cause for appellants C.P., J.P. and E.P. in A-6437-93T2 (Busch and Busch, attorneys for appellants *425 in A-6437-93T2 and respondents in A-569-94T2; Mr. Sears, of counsel and on the briefs).
John G. Tinker, Jr., argued the cause for respondent Township of Piscataway, Board of Education (on the state tort claims) in A-6437-93T2 (Leary, Bride, Tinker & Moran, attorneys; Mr. Tinker on the brief).
David B. Rubin argued the cause for respondent Township of Piscataway, Board of Education (on the federal civil rights claims) in A-6437-93T2.
Michael B. Blacker, attorney for appellant Joseph Carabillo in A-569-94T2.
No other parties participated in the appeal.
CUFF, J.A.D.
C.P. was sexually molested in a swimming pool by a volunteer instructor in a school board sponsored swimming program. Through her guardian ad litem, she appeals the dismissal of her Tort Claims Act claims and her federal civil rights claims against the school board. In a separate appeal, we must decide whether C.P. can execute on an Individual Retirement Account (IRA) held by the volunteer instructor in her effort to collect the default judgment entered against him.[1] We affirm the dismissal of the Tort Claims Act and federal civil rights claims and reverse the order authorizing execution against the defendant volunteer's IRA.
In 1990, C.P. was eight years old and in the third grade at an elementary school in Piscataway. In November 1990, she was a participant in a school board sponsored swimming program known as Swimming Education and Aquatic Safety (SEAS). Instruction was provided at the Grant Avenue Community Center in Plain-field.
*426 In November 1990, C.P. informed her mother that a volunteer male swim instructor at her swim class had touched her in the vaginal area. Her father contacted the principal at her school. The principal contacted the Division of Youth and Family Services which contacted the Union County Prosecutor's office. The volunteer, defendant Joseph Carabillo, was charged with aggravated sexual assault, sexual assault, and endangering the welfare of a child and ultimately pled guilty to sexual assault, a second degree offense, in exchange for the dismissal of the other charges.
According to the certifications, depositions, and answers to interrogatories submitted in support of and in opposition to the school board's motions for summary judgment, the SEAS program has been under the direction of Phyllis Woestemeyer, a physical education teacher employed by the school board, since its inception in 1972.
Ms. Woestemeyer's deposition testimony revealed that when a volunteer from the general public, rather than the school community, expressed an interest to participate in the SEAS program, she would speak to that person and ascertain what type of commitment he or she was willing to make. If the volunteer was from the school community, such as a high school student or a parent, she would contact someone at the high school who was familiar with the student or the parent before inviting him or her to participate in the program. If the volunteer was from the general public, she would try to speak to someone who knew the candidate. She did not conduct any formal interviews.
Defendant Carabillo's interest was communicated to Woestemeyer through his wife. Woestemeyer spoke to Mrs. Carabillo and inquired about his availability.
Prior to November 20, 1990, background checks of a volunteer's history of criminal behavior, psychiatric problems or substance abuse were not administered. Subsequent to Carabillo's assault of C.P., the school board developed an official policy regarding the screening of volunteers. Prior to the assault on C.P., there had *427 been no reported incidents of any assault on any participant by a volunteer.

I
In the action commenced in April 1991, C.P. and her parents asserted state law claims pursuant to the Tort Claims Act, N.J.S.A. 59:1-1 through 12-3, and federal civil rights claims pursuant to 42 U.S.C.A. § 1983 (§ 1983) against defendant Piscataway Board of Education, and negligence and intentional tort claims against Carabillo.
On December 20, 1993, Judge Robert A. Longhi entered partial summary judgment in favor of the school board dismissing the state claims for failure to satisfy the threshold set forth in N.J.S.A. 59:9-2d. He found that the claim asserted by C.P. was for emotional distress and that her proofs did not establish that she had sustained a permanent loss of a bodily function.
In opposition to the school board's motion for summary judgment, plaintiffs submitted the report of Marsha Heiman, Ph.D., a clinical psychologist who has treated C.P. In her report of her clinical interviews with C.P., which occurred within six weeks of the assault, she related that C.P. told her that initially she was very embarrassed by the touching and afraid to tell her parents. She said nightmares made her afraid to go to sleep. She expressed fear that Carabillo might try to hurt her and her family. She also expressed a fear that others, particularly older men, might try to touch her. Dr. Heiman rendered a diagnosis of acute post-traumatic stress disorder.
In her summary and recommendations, Dr. Heiman wrote:
[S]he experienced some symptoms of distress, consistent with a diagnosis of Post-Traumatic Stress Disorder. Her difficulty sleeping, frequent nightmares, decreased grades, clinging behavior, and other expressed fears are all manifestations of the initial trauma and are behaviors typically seen in children who have been sexually abused....
It is recommended that C. be seen in short term therapy to help reduce symptoms and to help her clarify and resolve any feelings that might still linger as a result of this experience. It is anticipated that with a short course of treatment, along with *428 her parent's support, C.'s symptoms will totally abate and she will not suffer any long term consequences.
In a supplemental report dated June 23, 1993, Dr. Heiman reported that she terminated visits with the child on February 4, 1991; however, since that date she had seen C.P. seven additional times: once in 1991, five times in 1992, and once in 1993. The 1993 visit was on June 22, 1993. Except for the last visit, some specific event triggered memories of the assault and "brought up additional issues which previously were not addressed." Dr. Heiman reported that C.P. experienced sleep difficulties in August 1991 and April 1992. Three visits in December 1992 were precipitated by sleep difficulties when she learned that Carabillo was being released from prison and returning to his home in a nearby community. Dr. Heiman noted that "[a]llowing C. to process her fears ... returned C.'s functioning to normal, and she was back on track developmentally."
Dr. Heiman concluded her report as follows:
C. has strong ego strengths and a supportive family, both of which mitigate against any permanent, long term consequence or emotional sequelae. As with any child, it remains a distinct possibility that C. could be triggered at any point in the future by events which bring back memories of the abuse, thereby producing transient short-term symptoms. Two years following the molestation, C. has experienced several episodes in which abuse issues have resurfaced and she has required therapy. With immediate intervention, however, C. shows the capacity to understand her feelings and reactions and quickly resolve any continued aftereffects from her abusive experience.
The negligence claims asserted on behalf of C.P. individually and by her parents against the school board are governed by the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 through 12-3. N.J.S.A. 59:9-2d provides:
No damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages for pain and suffering shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $1,000.00.... (emphasis supplied).
In Ayers v. Jackson Township, 106 N.J. 557, 525 A.2d 287 (1987), the Court rejected residents' claims against the municipality *429 for emotional distress caused by years of consumption of water from municipal wells contaminated by hazardous substances. Id. at 571, 525 A.2d 287. The Court noted that symptoms of depression, stress, health concerns, and anxiety constitute pain and suffering under the statute. Id. at 576, 525 A.2d 287.
In Srebnik v. State, 245 N.J. Super. 344, 585 A.2d 950 (App.Div. 1991), this court held that Ayers compelled the rejection of a woman's direct emotional distress claim. Id. at 349, 585 A.2d 950. We commented that the "permanent loss of a bodily function" language of section 9-2d referred to injury to the physical components of the body and not injury to a party's psyche. Id. at 351, 585 A.2d 950. We did recognize, however, that damages for emotional distress could be recoverable, if they resulted in "permanent physical sequelae such as disabling tremors, paralysis or loss of eyesight." Ibid.; accord Collins v. Union County Jail, 291 N.J. Super. 169, 677 A.2d 210 (App.Div. 1996), cert. granted ___ N.J. ___, ___ A.2d ___ (1996).
Plaintiffs argue that they are entitled to damages for pain and suffering under N.J.S.A. 59:9-2d based on C.P.'s "permanent loss of bodily function" which manifested itself in the form of the inability to sleep, bedwetting and nightmares. Plaintiffs urge that this position is supported by A.C.R. by L.R. v. Vara, 264 N.J. Super. 565, 625 A.2d 41 (Law Div. 1992). Plaintiffs' argument must be rejected because it is factually unsupported and contrary to the weight of authority.
Dr. Heiman has never stated that the fears and sleep disturbances suffered by the child were of a long-term much less a permanent nature. Rather, Dr. Heiman noted that the problems experienced by the child were transitory and quickly resolved. The direct implication of her opinion is that she expects no permanent psychological or physical sequelae from this disturbing incident. Moreover, C.P. has demonstrated no physical sequelae of a permanent nature.
A.C.R. also does not accurately reflect the weight of authority as reported in Srebnik and Collins. Moreover, a close reading of A.C.R. reveals a misperception of the ruling in Srebnik. The trial *430 court distinguished Srebnik by stating that "[i]n this matter the court has dismissed those claims that are factually similar to Srebnik, that is, the claims of the parents for emotional distress from observing the suffering of their children arising from the child's injury." Id. at 569, 625 A.2d 41. Addressing the direct claims of the children, the trial court held that the emotional injury suffered by the plaintiffs-victims of sexual molestation qualified as permanent loss of bodily function. Id. at 571-72, 625 A.2d 41. However, Srebnik, dismissed the direct claims of plaintiff for emotional distress. Srebnik, supra, 245 N.J. Super. at 349, 585 A.2d 950.
Judge Longhi properly dismissed the Tort Claims Act claims against the school board. We do not mean to minimize the psychological injury suffered by the child. In a case not governed by the Tort Claims Act, the emotional distress occasioned by the molestation would be an element of damages. Hume v. Bayer, 178 N.J. Super. 310, 428 A.2d 966 (Law Div. 1981). However, it is solely within the authority of the Legislature to determine whether damages for such claims shall be allowed against a public entity.
We observe, however, that since C.P. is a minor that dismissal should be without prejudice. Dr. Heiman notes that treatment of a child victim of sexual assault often occurs in segments. She expressed the situation as follows:
Although therapy helps many victims of sexual abuse recover from the traumatic impact of their victimization, it is not uncommon to find that a victim of sexual abuse will reexperience unresolved pieces of the trauma at a later date or be triggered by different cues in the environment which then precipitate symptoms. In fact for children the work around the trauma is often accomplished in pieces. By that I mean, that children sometimes are only able to resolve aspects of their abuse in developmental chunks, so that at other developmental periods, issues that couldn't be accessed at earlier times are now prime and available (e.g., adolescence raises sexual identity issues which then triggers memories of the abuse).
Thus, while the treating psychologist does not anticipate any permanent psychological disability due to the molestation by Carabillo, due to the nature of the developmental psychology of a child *431 to an adult, she simply cannot predict the future with any degree of certainty.
The school board cannot claim that such a disposition prejudices it. It has received timely notice of the claim and has engaged in substantial discovery of the relevant witnesses. Moreover, R. 4:10-2 allows it to conduct discovery it considers necessary and appropriate.

II
Following dismissal of the tort claims, the school board sought to dismiss the federal civil rights claims. Two motions for summary judgment were denied, as well as a motion for leave to appeal. When the case was assigned to Judge C. Judson Hamlin for trial, the school board renewed its motion for summary judgment and Judge Hamlin granted that motion.
Plaintiffs argue that the prior denials of the school board's motion for summary judgment became the law of the case and precluded renewal of the motion at the time of trial. Plaintiffs' position is without merit. The trial judge has the inherent power to review, revise, reconsider and modify interlocutory orders at any time prior to the entry of final judgment. Johnson v. Cyklop Strapping Corp., 220 N.J. Super. 250, 257, 531 A.2d 1078 (App.Div. 1987), certif. denied, 110 N.J. 196, 540 A.2d 189 (1988). A judge of coordinate jurisdiction should only consider vacating interlocutory orders entered by other judges when there is a clear showing of "fundamental error in law or the submission of new factual material." Cineas v. Mammone, 270 N.J. Super. 200, 208, 636 A.2d 1071 (App.Div. 1994); Sisler v. Gannett Co., Inc., 222 N.J. Super. 153, 159, 536 A.2d 299 (App.Div. 1987), certif. denied, 110 N.J. 304, 540 A.2d 1283 (1988).
Judge Hamlin appropriately exercised his discretion to revisit the federal civil rights liability of the school board. Liability of public bodies pursuant to § 1983 has received considerable attention from federal and state appellate courts and the standard *432 by which the actions of public bodies are evaluated has evolved over time. Thus, the case law which motivated the denial of a previous motion for summary judgment may well have been altered a year later. Indeed, the case relied on by the initial motion judge, Doe v. Taylor Indep. Sch. Dist., 975 F.2d 137 (5th Cir.1992) (Doe I), cert. denied, 506 U.S. 1087, 113 S.Ct. 1066, 122 L.Ed.2d 371, vacated, 987 F.2d 231 (5th Cir.1993), had a substantial subsequent history which ultimately led to the articulation of a different standard by which to assess the actions of the school board officials. See Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443 (5th Cir.) (Doe II), cert. denied, ___ U.S. ___, 115 S.Ct. 70, 130 L.Ed.2d 25 (1994). Moreover, the initial motion judge should have considered precedent from the Court of Appeals for the Third Circuit. Dewey v. R.J. Reynolds Tobacco Co., 121 N.J. 69, 80, 577 A.2d 1239 (1990). These circumstances, coupled with the Supreme Court's admonition to dispose of such claims whenever possible by motion, warranted a re-examination of the school board's application for summary judgment. See Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396, 410 (1982); Tice v. Cramer, 133 N.J. 347, 374, 627 A.2d 1090 (1993).
Adopting the deliberate indifference standard to evaluate the action by the school board and the SEAS coordinator to screen volunteers, Judge Hamlin granted the school board's motion for summary judgment. In his oral opinion he stated:
Clearly had there been any prior incidents or knowledge it would have been brought to the Court's attention. The best we have is one hearsay answer in an interrogatory which indicates that assuming for purpose of this motion that a high school teacher in a locker room patted someone on the fanny once, it seems to me the underlying thrust of the most recent cases is not to impute liability to a Board for, if you will, simple negligence or failure to take significant steps absent some information which would create in the mind of an objective person an awareness of an ongoing imminent danger to members of the student body or participant in a particular program.
* * * * * * * *
... I think that the clear implication of the case law that's been cited is that there would have to be some affirmative proof of a pattern of conduct, pattern or previous incident which would give rise to a person of reasonable apprehension and knowledge that it would be likely to repeat if in fact no affirmative action were *433 taken, and I don't mean now the affirmative duty that was previously espoused in your earlier case law to do something to protect the child.
In the instant case we have a one time situation arising at a shallow end of a pool wherein at least there were fifteen students and fifteen adults. To expect someone to foresee this sort of conduct absent some prior reported situation I think is to call upon us to impose a level of knowledge and foreseeability on people simply not consistent with human experience and understanding. The type of questions and background checks that are alleged to constitute deliberate indifference even on a long term policy basis simply I think is to ignore the clear understanding of human nature either in asking the question and what you're going to do with them and what are you going to do to check up if they give you an answer. Are we to officially assume that all things are false[?] That's really the underlying premise to the liability I think in this case ... I find Black particularly persuasive. I am satisfied that as a matter of law the factual circumstances here do not rise to the level of deliberate indifference.
We agree.
§ 1983 does not confer substantive rights. W.B. v. Matula, 67 F.3d 484, 493 (3d Cir.1995). Rather, the statute redresses deprivation of rights created by the Constitution or a federal statute. Ibid.; see also Rivkin v. Dover Township Rent Leveling Bd., 143 N.J. 352, 363, 671 A.2d 567 (1996).
In any § 1983 action, there are two levels of inquiry. First, we must identify "the person acting under color of law" that has caused the alleged deprivation. Rivkin, supra, 143 N.J. at 363, 671 A.2d 567. Second, we must identify the "right, privilege or immunity" secured by the Constitution or federal law. Ibid.
The school board is considered a person and may be sued directly under § 1983. Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611, 635 (1978); Henschke v. Borough of Clayton, 251 N.J. Super. 393, 401, 598 A.2d 526 (App.Div. 1991). However, a local government body cannot be sued under § 1983 for an injury inflicted solely by its employees or agents. Monell, supra, 436 U.S. at 694, 98 S.Ct. at 2037, 56 L.Ed.2d at 638. Stated otherwise, a municipality will not be held liable for federal civil rights claims based solely on respondeat superior. Groman v. Township of Manalapan, 47 F.3d 628, 637 (3d Cir.1995); Fagan v. City of Vineland, 22 F.3d 1283, 1291 (3d Cir.1994); Kollar v. Lozier, 286 N.J. Super. 462, *434 474, 669 A.2d 845 (App.Div. 1996); General Motors v. City of Linden, 279 N.J. Super. 449, 467, 653 A.2d 568 (App.Div. 1995), rev'd on other grounds, 143 N.J. 336, 671 A.2d 560 (1996). Rather, only in instances when "execution of a government's policy or custom ... inflicts the injury" will a local government be held liable. Monell, supra, 436 U.S. at 694, 98 S.Ct. at 2037-38, 56 L.Ed.2d at 638. In other words, a plaintiff must demonstrate that a "government custom or policy deprive[d] a person of his rights as a citizen" in order to recover under § 1983. Kollar, supra, 286 N.J. Super. at 474, 669 A.2d 845.
C.P. argues that the molestation violated her constitutional right to personal bodily integrity. Such a right has been recognized in Stoneking v. Bradford Area Sch. Dist., 856 F.2d 594, 599 (3d Cir.1988) (Stoneking I), cert. granted and judgment vacated, 489 U.S. 1062, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989); see also Doe I, supra, 975 F.2d at 138. Having identified the constitutional right, plaintiff must then establish how the school board's action violated that right.
In Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 725 (3d Cir.1989)(Stoneking II), cert. denied, 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990), the court held that a student sexually molested by her band teacher could maintain a § 1983 action if she could establish that the school board "established and maintained a policy, practice or custom which directly caused her constitutional harm."
Proof of the policy, practice or custom involves an examination not only of the decision made by a municipal officer but also that officer's decision-making authority. In Pembaur v. Cincinnati, the Court stated that
not every decision by municipal officers automatically subjects the municipality to § 1983 liability. Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official  even a policymaking official  has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before *435 the municipality can be held liable.... [W]hether an official had final policymaking authority is a question of state law.... We hold that municipal liability under § 1983 attaches where  and only where  a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.

[475 U.S. 469, 481-83, 106 S.Ct. 1292, 1298-1300, 89 L.Ed.2d 452, 464-65 (1986) (citations omitted) (emphasis supplied).]
See also St. Louis v. Praprotnik, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), and Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989).
Plaintiffs argue that Woestemeyer was the only representative of the school board making policy decisions pertaining to the hiring of volunteers in the SEAS program. The school board responds that Woestemeyer did not have the authority to establish official policy for the school district. In reality, no policy, official or unofficial, existed with respect to the hiring, supervision, and firing of SEAS volunteers. This dispute regarding Woestemeyer's status as a final decision-maker is legally irrelevant and, therefore, does not require denial of the school board's motion for summary judgment, Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 529, 666 A.2d 146 (1995), for plaintiff must still establish that the school board acted with deliberate indifference which directly caused a deprivation of her constitutional right. Stoneking II, supra; Black by Black v. Indiana Area Sch. Dist., 985 F.2d 707, 712-13 (3d Cir.1993).
"Deliberate indifference" is something of a contradiction in terms. Simmons v. City of Philadelphia, 947 F.2d 1042, 1089 (3d Cir.1991)(Sloviter, U.S.J., concurring). "Deliberate" connotes an intentional act, while "indifference" suggests a complete lack of interest. Id. at 1089-91. At a minimum, however, it encompasses knowledge of a risk, recognition of the harm posed by the risk, and a conscious decision to take no action or manifestly inadequate action to avoid the risk. Ibid. Plaintiff did not present sufficient evidence to create a genuine issue of material fact that any school board employee or official acted with deliberate indifference to her constitutional rights. This record is barren of any such proofs. *436 Indeed, Judge Hamlin noted the absence of any past incidents which would have alerted Woestemeyer or the school board to the risk.

III
Defendant Carabillo appeals from an order which granted plaintiffs' motion to turn over his IRAs. We reverse.
Default was entered against Carabillo and after a proof hearing, a default judgment was entered in the amount of $321,961.20, including prejudgment interest. Plaintiffs levied on two IRAs with a combined value slightly in excess of $10,000. By order dated August 19, 1994, plaintiffs' motion to turn over the funds in these accounts was granted. Carabillo's motion for reconsideration was denied.
On appeal, Carabillo argues that IRAs are exempt from claims of creditors pursuant to N.J.S.A. 25:2-1b. Plaintiffs counter that the statutory exemption for pension funds does not encompass IRAs, and if it does, Carabillo forfeited the exemption because he engaged in fraudulent transfers.
The motion judge held N.J.S.A. 25:2-1b does not include IRAs. He also accepted plaintiffs' argument that Carabillo's post-indictment fraudulent transfers stripped his IRAs of any protection afforded by statute. He reasoned that the transfer of some assets "open[ed] up all his assets, not just [the] fraudulently obtained assets to execution."
N.J.S.A. 25:2-1 provides:
a. Except as provided in subsection b. of this section, every deed of gift and every conveyance, transfer and assignment of goods, chattels or things in action, made in trust for the use of the person making the same, shall be void as against creditors.
b. Notwithstanding the provisions of any other law to the contrary, any property held in a qualifying trust and any distributions from a qualifying trust, regardless of the distribution plan elected for the qualifying trust, shall be exempt from all claims of creditors and shall be excluded from an estate in bankruptcy, except that:

*437 (1) no exemption shall be allowed for any preferences or fraudulent conveyances made in violation of the "Uniform Fraudulent Transfer Act," R.S. 25:2-20 et seq., or any other State or federal law; and
* * * * * * * *
For purposes of this section, a "qualifying trust" means a trust created or qualified and maintained pursuant to federal law, including, but not limited to section 401, 403, 408, or section 409 of the federal Internal Revenue Code of 1986 (26 U.S.C. § 401, 403, 408, or 409).
We are satisfied that this statute exempts IRAs from all claims of creditors. Section 1b exempts any property held in a "qualifying trust." "Qualifying trust" is defined as any trust created or qualified and maintained, including but not limited to section 408 of the Internal Revenue Code of 1986, 26 U.S.C.A. § 408. IRAs are governed by this section. The motion judge's reliance on the title of the 1993 bill which is the source of the current statute was misplaced. The title of legislation may be indicative of the provisions of a statute and the legislative intent; however, the title of a bill does not operate to negate the express terms of a statute. Gabin v. Skyline Cabana Club, 54 N.J. 550, 557, 258 A.2d 6 (1969).
It is undisputed that Carabillo engaged in fraudulent transfers after his indictment on criminal charges. Plaintiffs argue that section 1b(1) strips the exemption bestowed by statute on Carabillo's IRAs. We disagree.
N.J.S.A. 25:2-1b(1) provides:
(1) no exemption shall be allowed for any preferences or fraudulent conveyances made in violation of the "Uniform Fraudulent Transfer Act," R.S. 25:2-20 et seq., or any other State or federal law; ...
This subsection must be read in context and consistent with the legislative purpose. Matter of Mut. Benefit Life Ins. Co., 258 N.J. Super. 356, 375, 609 A.2d 768 (App.Div. 1992). It is apparent that the Legislature intended to create a safe harbor for pension funds, including IRAs; however, that safe harbor cannot be abused. Thus, an IRA cannot be used to evade a child support or equitable distribution obligation. N.J.S.A. 25:2-1b(2). Nor can a person create or fund an IRA when to do so would constitute a preference or fund an IRA with non-exempt assets when to do so *438 would constitute a fraudulent conveyance. However, an IRA which has not received preferential payments or fraudulently transferred assets is exempt from the claims of creditors, notwithstanding the fraudulent transfer of other assets.
N.J.S.A. 25:2-29 also provides no relief to plaintiffs; it provides:
a. In an action for relief against a transfer or obligation under this article, a creditor, subject to the limitation in R.S. 25:2-30, may obtain:
* * * * * * * *
(2) An attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by Chapter 26 of Title 2A of the New Jersey Statutes and by Rule 4:60 et seq. of the Rules Governing the Courts of the State of New Jersey; (emphasis supplied).
Unquestionably, plaintiffs could seek to recover the assets that were fraudulently conveyed from the transferee. They could also seek to attach other property of the transferee as a remedy for a fraudulent conveyance. However, in this case the transferees were Carabillo's wife and other family members. The IRAs were never transferred.
Affirmed in part; reversed in part.
NOTES
[1] These appeals are consolidated for purposes of this opinion.