709 A.2d 1347

LEA GILCHINSKY, PLAINTIFF/APPELLANT, v. NATIONAL WESTMINSTER BANK NJ, THE RODGERS AND HAMMERSTEIN ORGANIZATION, THE ESTATE OF RICHARD RODGERS, THE ESTATE OF DOROTHY RODGERS, THE ESTATE OF OSCAR HAMMERSTEIN II, JACK TERHUNE, SHERIFF OF BERGEN COUNTY AND JOHN DOES 1–10 (WHOSE IDENTIFIES ARE NOT YET KNOWN), DEFENDANTS/RESPONDENTS.

THE RODGERS AND HAMMERSTEIN ORGANIZATION, PLAINTIFF/RESPONDENT, v. LEA GILCHINSKY, DEFENDANT/APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued March 31, 1998—Decided May 12, 1998.

340

Before Judges PRESSLER, CONLEY and WALLACE.

*David L. Wecht* argued the cause for appellant (*Dollinger & Dollinger*, attorneys; *Merrill M. O'Brien* and *Mr. Wecht*, of counsel and on the brief).

*Charles C. Abut* argued the cause for respondent (*Lowen & Abut*, attorneys; *Mr. Abut*, of counsel and on the brief).

The opinion of the court was delivered by

WALLACE, J.A.D.

These appeals, calendared separately, are consolidated for the purpose of this opinion. The crucial issue is whether pension funds rolled over into an Individual Retirement Account (IRA) maintain their exemption from levy status under *N.J.S.A.* 25:2–1. The motion judge found that the rollover to the IRA was a fraudulent conveyance and, therefore, concluded that the funds were subject to levy. We disagree and reverse.

## I

Plaintiff Rogers and Hammerstein Organization (R & H) employed defendant Lea Gilchinsky in New York in various capacities from 1980 to 1991. R & H periodically deposited funds into the company's Profit Sharing Plan (the Plan) on behalf of Gilchinsky. Gilchinsky liked to gamble. In order to support her gam-

bling habit, she began to embezzle funds from R & H. At some point, Gilchinsky's wrongdoing was discovered. R & H claimed that Gilchinsky diverted a total of $759,869 and only returned $28,700. Gilchinsky was subsequently indicted in New York for grand larceny in the second degree for theft of property in excess of $50,000. On May 15, 1992, she pled guilty to attempted grand larceny in the second degree, admitting she had taken property in excess of $50,000. She was sentenced to one year in prison.

On July 21, 1992, R & H filed suit against Gilchinsky in New York seeking to recover the funds she had stolen. In January 1993, R & H sought a restraining order and summary judgment against Gilchinsky for damages in the total amount of $935,643, representing approximately $731,000 in embezzled funds and $204,500 in salary and bonuses paid during the course of her embezzlement. On January 12, 1993, the trial court entered an order restraining Gilchinsky from making any sale or assignment of any personal and/or real property. In February 1993, the judge granted summary judgment in favor of R & H as to liability and partial judgment as to damages in the amount of $226,455.93 plus interest. Further, the judge directed that a hearing be held in the future to determine the full extent of R & H's damages.[1]

Meanwhile Gilchinsky established an IRA account with a branch of the National Westminster Bank NJ (NatWest) in Fort Lee, New Jersey. She had been banking there since 1991. In June 1994, Gilchinsky requested that R & H roll her pension funds in the Plan into her NatWest IRA. The value of Gilchinsky's interest in the Plan was fixed at $84,280.55 as of June 30, 1994.

In October 1994, R & H deposed Gilchinsky in aid of enforcement of its judgment. Gilchinsky acknowledged that she had an account with NatWest, but denied having an IRA.

---

[1] The record does not reveal whether a subsequent hearing was held. On December 28, 1994, the New York court entered judgment in favor of plaintiff in the amount of $226,435 plus interest of $49,696.

On November 21, 1994, Gilchinsky wrote to R & H, enclosing the election form to execute the transfer of her share in the Plan into her IRA account. She wrote in part:

I have opened an Individual Retirement Account in my name with NatWest Bank at: 156 Linwood Plaza, Fort Lee, New Jersey 07024–Account Number ... Like most banks, NatWest dis-allows a direct rollover to an individual retirement account by a wire transfer—to insure a paper trail, and since a wire transfer isn't a requirement by law, I trust that you will find the means to execute the immediate transfer of the funds in the said plan, with no further delay.

A settlement conference was held in New York on December 20, 1994. R & H sought to recover a substantial part of the Plan monies, but agreed to allocate a portion to Gilchinsky for her support and counsel fees. The parties were not able to reach an agreement. On December 28, 1994, Gilchinsky faxed a letter to R & H rejecting any settlement offer and reiterating her demand to transfer her money in the Plan to her IRA. On December 30, 1994, R & H complied with Gilchinsky's request and transferred $84,280 from the Plan to her IRA in NatWest.

On January 5, 1995, R & H filed a complaint on foreign judgment in the Law Division of Bergen County and on January 9, 1995, by order to show cause, sought a writ of attachment and domestication of the New York judgment. The motion judge issued a writ attachment on January 10, 1995, and scheduled a hearing for January 25. At the hearing, Gilchinsky's New York counsel raised the issue of whether *N.J.S.A.* 25:2–1 protected Gilchinsky's IRA account from attachment and indicated that perhaps the matter could be settled. The judge gave counsel two days to accomplish settlement and, if no settlement could be reached, to submit opposing papers. Counsel did neither. On February 2, 1995, the judge entered judgment against Gilchinsky, domesticating the New York judgment and directing the turnover of all property levied upon under the January 10 writ of attach-ment, including Gilchinsky's IRA account.

Although discussions between counsel for the parties occurred, it was not until March 3, 1995, that Gilchinsky's New York counsel wrote to the judge requesting a one-week stay of enforcement of

the levy on the IRA account to permit Gilchinsky to obtain local counsel. On March 21, 1995, Gilchinsky's local counsel contacted Noah A. Kinigstein of NatWest and requested that the IRA funds not be distributed to R & H as it would be in violation of *N.J.S.A.* 25:2–1. Kinigstein informed counsel that the funds had not yet been transferred, but that Gilchinsky should move immediately for a stay. Counsel replied that he could not file such a motion until March 29. No motion for a stay was filed. On April 4, 1995, NatWest forwarded to R & H the funds previously held in Gilchinsky's IRA account.

On April 28, 1995, Gilchinsky initiated a separate action by way of complaint and order to show cause seeking a summary determination that her IRA was immune from levy. Oral argument was held on May 9, 1995, and by order dated May 18, 1995, the motion judge denied Gilchinsky's application. Over one year later, R & H and NatWest moved for summary judgment in Gilchinsky's action, contending the complaint was barred by the entire controversy doctrine and that *N.J.S.A.* 25:2–1 did not protect Gilchinsky's IRA from attachment and levy. The motion judge granted summary judgment against Gilchinsky on June 7, 1996, and dismissed her action on entire controversy grounds.

Gilchinsky moved for reconsideration on June 21, 1996, and simultaneously moved in R & H's action for relief under *R.* 4:50 from the February 2, 1995 judgment. Argument on both motions was held on September 13, 1996. The motion for reconsideration in Gilchinsky's action was denied by order dated September 13, 1996. However, the judge granted Gilchinsky's motion for relief from the February 2, 1995 judgment, for the purpose of determining whether R & H's attachment of Gilchinsky's IRA was in violation of *N.J.S.A.* 25:2–1.

On October 10, 1996, Gilchinsky appealed the dismissal of her complaint in her action and moved before the trial court, pursuant to *R.* 2:7–1, for relief from paying filing fees and costs in connection with her appeal. Following oral argument on October 11, 1996, the motion judge directed the parties to submit further

briefs on whether *N.J.S.A.* 25:2–1 protected Gilchinsky's IRA from levy. After additional briefing and argument, on March 7, 1997, the judge found that Gilchinsky had directed the transfer of the funds to her New Jersey IRA to thwart R & H's ability to satisfy the New York judgment, and the transfer was a fraudulent conveyance. Therefore, the judge concluded, Gilchinsky's IRA was not protected from levy under *N.J.S.A.* 25:2–1. The judge denied Gilchinsky relief from the February 2, 1995 judgment and denied her request to waive filing fees.

## II

Initially, we find no need to address Gilchinsky's arguments in her appeal from the dismissal of her complaint based on the entire controversy doctrine. We are satisfied that once Gilchinsky was successful in obtaining relief from the February 2, 1995 judgment, in that the judge addressed whether the levy on her IRA should be set aside, her appeal in the second action was rendered moot. Consequently, we dismiss Gilchinsky's appeal under docket number A–0907–96T5 as moot.

## III

We turn now to Gilchinsky's appeal from the judgment in favor of R & H authorizing the levy upon her IRA. Specifically, Gilchinsky contends the funds deposited in the Plan were exempt from the reach of creditors while in the Plan under ERISA, and after her transfer of those benefits to her IRA the funds were exempt under *N.J.S.A.* 25:2–1. Further, she argues that the transfer from the Plan into her IRA was not a fraudulent transfer.

The anti-alienation provision found in ERISA mandates, "[e]ach pension plan shall provide that benefits under the plan may not be assigned or alienated." 29 *U.S.C.A.* § 1056(d)(1). The United States Supreme Court held this anti-alienation provision was clear and evidenced the congressional policy to "safeguard, a stream of income for pensioners (and their dependents who may be blameless), even if that decision prevents others from securing relief for

the wrongs done them." *Guidry v. Sheet Metal Workers Nat'l Pension Fund,* 493 *U.S.* 365, 376, 110 *S.Ct.* 680, 687, 107 *L.Ed.*2d 782, 795 (1990), *appeal after remand,* 10 *F.*3d 700 (10th Cir.1993), *reh'g,* 39 *F.*3d 1078 (10th Cir.1994), *cert. denied,* 514 *U.S.* 1063, 115 *S.Ct.* 1691, 131 *L.Ed.*2d 556 (1995).

However, a person may lose the protection of this safe harbor provision after receipt of the funds. *See State v. Pulasty,* 136 *N.J.* 356, 361, 642 *A.*2d 1392, *cert. denied,* 513 *U.S.* 1017, 115 *S.Ct.* 579, 130 *L.Ed.*2d 494 (1994). In *Pulasty,* defendant was charged with embezzling more than $600,000 as treasurer of the New Jersey State Firemen's Association. *Id.* at 358, 642 *A.*2d 1392. As part of a plea bargain, defendant pled guilty to second degree theft by deception and agreed to pay restitution. *Ibid.* Defendant appealed, contending that the trial court's restitution order "directly or indirectly garnished his pension in violation of ERISA." *Id.* at 359, 642 *A.*2d 1392. The Court affirmed the restitution order noting "that ERISA's nonalienability clause is based on a congressional intent to ensure that pensioners actually receive their benefits, not to make them judgment proof." *Id.* at 361, 642 *A.*2d 1392. The Court further explained that:

> [o]ur decision today creates no exception to ERISA's non-alienability clause. **That clause is inapplicable in a case such as this, which concerns restitution to be paid out of funds that are unprotected because they are in the pensioner's possession, not out of protected benefits that are owed to the pensioner** ... We are satisfied that "the congressional policy choice" contained in the non-alienability clause, specifically the **"decision to safeguard a stream of income for pensioners (and their dependents * * *), even if that decision prevents others from securing relief for wrongs done to them, was not designed to make pensioners judgment proof."**
>
> [*Pulasty, supra,* 136 *N.J.* at 361, 642 *A.*2d 1392] (internal citations omitted) (emphasis added).

We turn now to address whether Gilchinsky's funds continued to enjoy the protection from levy after transfer to her IRA account. IRAs are created under the authority of the Internal Revenue Code (Code), 26 *U.S.C.A.* § 408. This section sets forth the requirements of an IRA. *See* 26 *U.S.C.A.* § 408(a). The Code permits early withdrawal of funds from the IRA subject to a withdrawal penalty. *See* 26 *U.S.C.A.* § 408(k)(4). Unlike the

ERISA statute, the Code does not contain an anti-alienation provision. *See 26 U.S.C.A.* § 408(d). Thus, State law controls whether an IRA enjoys a similar protection from levy as funds in an ERISA account. *See Aronsohn & Springstead v. Weissman,* 230 *N.J.Super.* 63, 67, 552 *A.2d* 649 (App.Div.), *certif. denied,* 117 *N.J.* 36, 563 *A.2d* 808 (1989)(superseded by statute).

In *Aronsohn,* we addressed whether a qualified Keough plan, which is similar to an IRA, but more restrictive in who may own such a Plan, was subject to execution by a judgment creditor. We found that because Keough plans are essentially trust funds where the settlor retains control over the funds and may withdraw the funds at any time subject to the payment of a tax penalty, those funds were not exempt from attachment by a judgment creditor. *Id.* at 67–70, 552 *A.2d* 649.

Subsequent to our decision in *Aronsohn,* the Legislature adopted *N.J.S.A.* 25:2–1. This statute provides in part:

a. Except as provided in subsection b. of this section, every deed of gift and every conveyance, transfer and assignment of goods, chattels or things in action, made in trust for the use of the person making the same, shall be void as against creditors.

b. Notwithstanding the provisions of any other law to the contrary, **any property held in a qualifying trust and any distributions from a qualifying trust** ... **shall be exempt from all claims of creditors and shall be excluded from an estate in bankruptcy,** except that:

(1) **no exemption shall be allowed for any preferences or fraudulent conveyances made in violation of the "Uniform Fraudulent Transfer Act,"** R.S.25:2–20 et seq., or any other State or federal law; and

. . . .

For purposes of this section, a "qualifying trust" means a trust created or qualified and maintained pursuant to federal law, including, but not limited to, section 401, 403, 408, or section 409 of the federal Internal Revenue Code of 1986 (26 U.S.C. § 401, 403, 408 or 409).

[*N.J.S.A.* 25:2–1] (emphasis added).

As noted above, an IRA is created pursuant to federal law and is a qualifying trust. *See 26 U.S.C.A.* § 408. Consequently, pursuant to *N.J.S.A.* 25:2–1, funds in an IRA are exempt from "all claims of creditors," unless found to be a fraudulent conveyance made in violation of the Uniform Fraudulent Transfer Act, *N.J.S.A.* 25:2–10 *et. seq. See C.P. v. Piscataway Township Bd. of*

*Educ.*, 293 *N.J.Super.* 421, 436–38, 681 *A.*2d 105 (App.Div.1996). Thus, *N.J.S.A.* 25:2–1 essentially overruled our holding in *Aronsohn.*

The crucial question is whether the transfer here was a fraudulent conveyance. *N.J.S.A.* 25:2–25 describes transfers which are fraudulent to present and future creditors:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> a. With actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> . . .

[<em>N.J.S.A.</em> 25:2–25(a).]

*N.J.S.A.* 25:2–26 lists numerous factors a judge may consider in determining fraudulent intent:

> a. The transfer or obligation was to an insider;
>
> b. The debtor retained possession or control of the property transferred after the transfer;
>
> c. The transfer or obligation was disclosed or concealed;
>
> d. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>
> e. The transfer was of substantially all the debtor's assets;
>
> f. The debtor absconded;
>
> g. The debtor removed or concealed assets;
>
> h. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
>
> i. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
>
> j. The transfer occurred shortly before or shortly after a substantial debt was incurred; and
>
> k. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

[<em>N.J.S.A.</em> 25:2–26.]

As noted above, the motion judge held that Gilchinsky's rollover of the Plan funds to her IRA was a fraudulent transfer. In reaching this conclusion, the judge found that the timing of the transfer after the New York judgment, the lack of any discernable New Jersey contacts, and the transfer in violation of a restraining

order in New York, compelled the conclusion that the transfer was fraudulent.

■ Unfortunately, the motion judge considered only a few of the factors under *N.J.S.A.* 25:2–26 in reaching his decision. In our view, the controlling factors that the transfer here was not a fraudulent conveyance are: that the transfer was not concealed; the creditor, R & H, participated in the transfer; and the funds continued to be held in a trust account after the transfer. In addition, we are unable to conclude from this record that the transfer was in violation of a New York restraining order. The New York court had entered a temporary restraint against Gilchinsky's removal of any personal property as part of the February 1995 order to show cause. The subsequent orders granting partial summary judgment as to liability and later as to damages did not contain any restraints, however. If R & H was of the view that the transfer was fraudulent or contrary to court order, it should have sought the aid of the court. After all, Gilchinsky first requested the transfer in July 1991, and the transfer was not made until December 30, 1994. Thus, R & H had sufficient time to ask the court for any protection to which it may have been entitled.

Moreover, we perceive no advantage that Gilchinsky obtained as a result of the transfer to her New Jersey IRA. If the transfer had been made to a New York IRA, the funds in that IRA would similarly have been exempt from levy. *See Bank Leumi Trust Co. v. Dime Savs. Bank,* 85 *N.Y.*2d 925, 626 *N.Y.S.*2d 999, 650 *N.E.*2d 846 (1995) (IRA created as a result of rollover from qualified pension plan is exempt from judgment creditor's levy). The transfer from the Plan to Gilchinsky's IRA, whether the IRA was in New York or in New Jersey, was merely a change in the form of a qualified trust.

■ Simply put, there was insufficient evidence in the record to find a fraudulent transfer. The thrust behind a fraudulent transfer is that the debtor conveys title to assets to a third person for the purpose of placing them beyond the reach of creditors. The

situation here is certainly unlike such a scenario because the creditor, R & H, participated in the transfer of the assets from one form of trust held in the Plan to another form of trust held in Gilchinsky's IRA.

We are satisfied that Gilchinsky's IRA at NatWest was entitled to the safe harbor protection the Legislature created for pension funds. *See N.J.S.A.* 25:2–1. To be sure, this protection from levy would be lost if Gilchinsky elects to withdraw early from her IRA. In that event, the funds would lose their status as a qualifying trust and would no longer be exempt from levy. *See Pulasty, supra,* 136 *N.J.* at 361, 642 *A.*2d 1392.

We add one further point. R & H may protect itself by an order requiring NatWest to notify R & H prior to any early withdrawal by Gilchinsky. However, absent early withdrawal, R & H may not levy upon Gilchinsky's IRA account held by Nat-West.

In appeal number 4544–96T2, we reverse and remand for reinstatement of Gilchinsky's IRA account. Appeal number 0907–96T5 is dismissed as moot.