707 A.2d 1021

MICHAEL BLUNT, PLAINTIFF–APPELLANT/CROSS–RESPON-
DENT, v. ANNA KLAPPROTH, BOROUGH OF MERCHANT-
VILLE, A MUNICIPAL ENTITY OF THE STATE OF NEW
JERSEY, LT. J.W. CORNEY, AND TOWNSHIP OF PENNSAUK-
EN, A MUNICIPAL ENTITY OF THE STATE OF NEW JERSEY,
DEFENDANTS–RESPONDENTS/CROSS–APPELLANTS, AND
DAVID WIRTZ, DEFENDANT.

Superior Court of New Jersey
Appellate Division

Argued February 11, 1998—Decided March 3, 1998.

494

Before Judges SHEBELL, D'ANNUNZIO and A.A. RODRIGUEZ.

*Michele Gibson* and *David E. Mapp,* argued the cause for appellant/cross-respondent, Michael Blunt (*Harvey C. Johnson,* attorney; *Ms. Gibson* and *Mr. Mapp,* on the brief).

*Lawrence Berg,* argued the cause for respondents/cross-appellants, J.W. Corney and Township of Pennsauken (*Marshall, Dennehey, Warner, Coleman & Goggin,* attorneys; *Mr. Berg* and *Daniel D. Haggerty,* on the brief).

*Cindy M. Perr,* argued the cause for respondent/cross-appellant, Borough of Merchantville (*White and Williams,* attorneys; *Michael O. Kassak* and *Ms. Perr,* nee *Raganelli,* on the brief).

*John Mirabella,* argued the cause for respondent/cross-appellant, Anna Klapproth (*Duffy and Quinn,* attorneys; *Mr. Mirabella,* of counsel, and on the brief).

The opinion of the court was delivered by

SHEBELL, P.J.A.D.

This appeal and cross-appeal are from the several grants of summary judgment that resulted in the dismissal of all claims against all defendants.  We affirm.

On February 7, 1992, plaintiff filed a complaint seeking damages for injuries he suffered as a result of his being shot.  Specifically, he alleged that defendant, Police Lieutenant, J.W. Corney and his employer, Township of Pennsauken, violated a special duty of care they owed to him because of Corney's alleged insufficient training

and supervision in the removal of barricaded persons and in the utilization of civilian support services. He further alleged that defendant, Borough of Merchantville, negligently allowed one of its police officers to serve the summonses in a different municipality, thereby instigating a confrontation with the shooter, defendant, David Wirtz; that Wirtz was negligent in shooting him without just cause; and that defendant, Anna Klapproth, now deceased, was negligent in the storage of the weapon and in not knowing that her grandson, Wirtz, had removed the weapon from her home. The complaint was answered by all defendants except Wirtz.

On November 10, 1993, Klapproth filed a motion for summary judgment which was argued on December 17, 1993. The motion was granted. We denied plaintiff's motion for leave to appeal, and the Supreme Court denied certification.

On February 15, 1995, Merchantville moved for summary judgment. This motion was granted. Plaintiff then, on March 20, 1995, moved for reconsideration of the 1993 order granting Klapproth summary judgment. This was denied. On March 31, 1995, a summary judgment motion brought by Pennsauken and Corney was denied. Subsequently, plaintiff moved for reconsideration as to Merchantville. This was denied on April 28, 1995. On July 14, 1995, Pennsauken and Corney's second motion for summary judgment was denied.

On August 7, 1995, plaintiff moved for summary judgment as to all remaining defendants, and Pennsauken and Corney filed a cross-motion for summary judgment. Argument on the motions was held on September 11, 12 and 13, 1995, at the conclusion of which Pennsauken and Corney's motion was granted. On October 20, 1995, plaintiff's motion for reconsideration with respect to Pennsauken and Corney was denied. Plaintiff sought leave to appeal with respect to this order for summary judgment, which was denied on December 8, 1995. A proof hearing was held, and on November 14, 1996, judgment was entered against Wirtz for damages in the amount of $2,348,307.96.

Plaintiff appeals and Merchantville, Pennsauken, Corney, and Klapproth cross-appeal.

The relevant facts begin on January 11, 1990, when Officers John Seeley and Bruce Bianchi of the Merchantville Police Department observed David Wirtz walking erratically in the street two feet from the curb. They had contact with Wirtz before and were aware that he exhibited erratic behavior. The officers told Wirtz to stop walking in the street, but shortly thereafter, they observed him continuing to walk in the street. Seeley told Wirtz to approach the vehicle and produce identification. Wirtz did this without incident. Seeley then conducted a pat-down search of Wirtz because he observed that Wirtz's pockets were bulging. Wirtz removed a four to five inch screwdriver from his pocket. Stepping back in a defensive position, he raised the screwdriver in a threatening manner, moving his arm up and down. According to Seeley, Wirtz was "raving," saying, "I'm not going to be touched by any faggot cops.... If they do, I'll kill them." Wirtz also threatened to kill Lieutenant Silvers, his former father-in-law, who, he claimed, had broken up his marriage. Wirtz asked if he was under arrest and then ran from the police, who were unable to find him.

The officers filed simple assault and resisting arrest charges against Wirtz. On February 5, 1990, two summonses ordering Wirtz to appear on March 5, 1990 in the Merchantville Municipal Court to answer the charges were issued.

On February 7, 1990, at approximately 5:30 p.m., a Merchantville patrol officer observed Wirtz walking on the street. He contacted his department and was instructed to proceed against Wirtz. When he called to Wirtz, Wirtz screamed "stay away from me" and ran towards his boarding house in Pennsauken, which was just across the border from Merchantville. The officer followed him and discovered that Wirtz had locked himself in his apartment. He refused to open the door and screamed repeatedly that the officer should go away and that he had been raped by various individuals, including the police.

The officers summoned back-up from the Merchantville and Pennsauken Police Departments. Upon arrival, Officer Whitmore of Merchantville attempted to speak with Wirtz. Whitmore was concerned because Wirtz had constantly been seen outside the back of the Merchantville police station watching the police at shift changes. Whitmore told Sergeant Cox of Pennsauken about the January 11 incident when Wirtz "had threatened to kill any cop that came near him," and that the Merchantville municipal judge wanted Wirtz arrested. Whitmore and Cox agreed that a crisis worker should be called. Cox then called the Steininger crisis center, as well as the defendant, Lieutenant J.W. Corney, of the Pennsauken Police Department, for assistance.

Whitmore and Cox told Corney that it was the judge's desire that Wirtz be arrested. However, Corney told them he was not inclined to do so because of Wirtz's mental state. He suggested the summons should be thrown under the door. He did not believe Wirtz posed a threat to anybody, including himself. Corney repeated this to his captain, who arrived at the scene. He told the captain: "[I]f they want to get a warrant and bring a warrant over, got a new ball game. Got a summons, I'm not bringing him in . . . ." Whitmore, Cox and Corney then agreed to wait until the crisis worker arrived.

Plaintiff, certified by the State Division of Mental Health as a crisis intervention specialist, had previously instructed both Merchantville and Pennsauken police in handling crisis situations. He, together with another crisis worker, Paul Snyder, arrived at the scene and Corney explained what had happened. According to Corney, he told them that Merchantville had a summons for Wirtz and that it was impossible to communicate with Wirtz because he kept claiming everyone was trying to rape him. Plaintiff claims he was told that there was an outstanding warrant for Wirtz's arrest. Plaintiff told Corney that because Wirtz had threatened a police officer, Wirtz needed to be taken into custody and evaluated, which could be done after Wirtz was taken to jail. Plaintiff attempted to speak with Wirtz, but Wirtz kept repeating

that he did not "talk to niggers because niggers raped him." Snyder then attempted to talk to Wirtz, but Wirtz refused claiming that Snyder was a white doctor and that white doctors had raped him. From these encounters, plaintiff concluded that Wirtz was suffering from "bizarre delusional behaviors and thoughts," which was an additional reason for Wirtz to be "brought in" for evaluation.

Corney checked with other residents of the boarding house and was told that Wirtz was sometimes seen with a knife in his possession, but that he had not been seen with a knife that day. Corney obtained a key to Wirtz's room from the landlord, and the officers and plaintiff then planned the strategy they would use to apprehend Wirtz. Corney said they would need some sort of protection, and plaintiff suggested using a rolled-up rug, which plaintiff said he had used several times in subduing individuals. Corney agreed to enter the room and if there was a problem, plaintiff could throw the rug on Wirtz.

Corney unlocked the door and it opened only a short distance because there was a chain on the door. Plaintiff told Corney to step aside, and plaintiff forced the door open. As Corney and plaintiff entered the darkened room, Wirtz fired a .22 caliber rifle he had stolen from the Klapproth house. The bullet struck plaintiff, exited through his back, and then struck another officer. Wirtz was eventually apprehended.

## I

In arguing it was error to grant Pennsauken and Corney summary judgment, plaintiff maintains that immunity under *N.J.S.A.* 59:5–2b(3) is not applicable because Pennsauken and Corney did not offer evidence that an arrest was intended. In the alternative, plaintiff claims summary judgment was inappropriate because there is a factual dispute as to whether an arrest was intended.

We are satisfied that Pennsauken and Corney are entitled to immunity under *N.J.S.A.* 59:5–2b(2) and (3), because Wirtz was

avoiding detention. Under *N.J.S.A.* 59:5–2b, neither a public entity nor a public employee is liable for any injury caused by:

(1) an escaping or escaped prisoner;

(2) an escaping or escaped person; or

(3) a person resisting arrest; or

(4) a prisoner to any other prisoner.

Because Wirtz was not a prisoner, b(1) and b(4) are not applicable. Pennsauken and Corney are, however, entitled to immunity under b(2) and b(3).

In granting summary judgment to Pennsauken and Corney, the judge addressed the issue of whether an arrest was intended for purposes of the resisting arrest immunity under *N.J.S.A.* 59:5–2b(3):

This Court must look at the acts and the actions as to what was transpiring at the time of the event rather than the language that was used by an of the individuals at the time of the event.

. . . .

Recognizing the situation where they first attempted to talk Mr. Wirtz into coming out from the room where he had barricaded himself and then decided to break down the door and forcibly take him into custody and restrain his freedom, it is this Court's determination that that language and those actions equal the actions anticipated by the legislature when they use the term a person resisting arrest.

Mr. Wirtz obviously was resisting being taken into custody. When the police authorities take one's physical being into custody and restrain that physical being from utilizing his freedom, that is an arrest. No matter what the police officer might call it, it's an arrest.

Plaintiff contends that Pennsauken and Corney were not entitled to summary judgment because they did not specifically plead immunity under section 5–2b(3). The burden is on the public entity to plead and prove its immunity under the Act. *Kolitch v. Lindedahl,* 100 *N.J.* 485, 497, 497 *A.*2d 183 (1985). However, immunity is not waived simply because the public entity fails to plead the specific statutory section relied upon. *Rivera v. Gerner,* 89 *N.J.* 526, 535, 446 *A.*2d 508 (1982). We have held that the failure of either side to plead or argue the effect of the Act would not prevent its consideration on appeal. *Myers v. Medford Lakes Bd. of Educ.,* 199 *N.J.Super.* 511, 515, 489 *A.*2d 1240 (App.Div.1985); *Massaker v. Petraitis,* 173 *N.J.Super.* 459, 462,

414 *A*.2d 590 (App.Div.1980). Moreover, in their answer, Pennsauken and Corney pled immunity under the Act as a separate defense. Thus, there is no merit to plaintiff's contention that failure to specifically plead immunity under section 5–2b(3) defeats this defense.

In *Tice v. Cramer,* 133 *N.J.* 347, 356, 627 *A*.2d 1090 (1993), which involved the question of whether immunity should apply when the driver of a vehicle being pursued by the police strikes a bystander, the Court held that section 5–2b(2) confers absolutely immunity, except where the police engage in willful misconduct. The Court found that the fact that the driver was never arrested or not even subject to arrest was irrelevant:

> The possible distinctions between an escaping prisoner, an escaping person, or simply a person eluding an officer do not bear sufficient relationship to the purposes of immunity to warrant attributing such an intent to the Legislature when none is even hinted. To the extent that the section is viewed in the context of police pursuit, the anomaly of such distinctions becomes apparent.
>
> The Legislature presumably wanted to provide very specific immunity to police officers in the pursuit of wrongdoers who were escaping or who had escaped.... It seems most unlikely that the Legislature would want to base that immunity on the technical status of suspects as persons who had just been arrested, or who were about to be arrested, or for whom good cause for arrest existed. The most likely legislative intention evinced by the statutory language in the context of police pursuit is that when the officer suspected someone of having violated the law and was pursuing him, the officer's conduct was immune from liability.
>
> [*Id.* at 360–61, 627 *A*.2d 1090.]

The Supreme Court agreed with this court's statement that the words "escaped or escaping person" should not receive "a cramped interpretation ·in view of the clear legislative objective of immunity." *Id.* at 361, 627 *A*.2d 1090 (quoting *Tice v. Cramer,* 254 *N.J.Super.* 641, 650, 604 *A*.2d 183 (App.Div.1992)). "The fair meaning of the words suggests a situation in which *any* person is trying to avoid apprehension by a police officer." 133 *N.J.* at 362, 627 *A*.2d 1090. It added that for immunity purposes, there was no meaningful distinction between whether the police intended a full arrest as opposed to a temporary detention or "because at the time of the escape the process had not reached the point of physical control over the suspect." *Id.* at 362, 376, 627 *A*.2d 1090

(quoting *Kisbey v. California*, 36 *Cal*.3d 415, 204 *Cal.Rptr.* 428, 431, 682 *P*.2d 1093, 1096 (1984)). In support of its interpretation, the Court cited the need to encourage vigorous law enforcement as one of the clear purposes of this section of the Act. *Id.* at 363, 627 *A*.2d 1090.

■ We hold that Pennsauken and Corney are entitled to immunity under *N.J.S.A.* 59:5-2b. This section "provides absolute immunity for injuries caused by persons who are ... resisting arrest, escaping, or who have escaped, *or who are being pursued by police after having failed to stop at police command.*" Margolis & Novack, *Claims Against Public Entities,* comment to *N.J.S.A.* 59:5-2 (Gann 1997) (emphasis added). Wirtz failed to stop at a police command, fled, locked himself in his room and caused injury to plaintiff while the police were trying to take him into custody. Plaintiff's injury was caused by a person avoiding apprehension as a result of police pursuit. *Tice, supra,* 133 *N.J.* at 377, 627 *A*.2d 1090. The technical issue of whether an arrest was intended is not a material issue for purposes of this immunity. *Ibid.* Thus, summary judgment was appropriate, as there were no material issues of fact.

We need not consider whether Pennsauken and Corney were also entitled to immunity under *N.J.S.A.* 30:4-27.7(a), which provides:

> A law enforcement officer ... acting in good faith pursuant to this act who takes reasonable steps to assess, take custody of, detain or transport an individual for the purposes of mental health assessment or treatment is immune from civil and criminal liability.

This statute has been described as providing another layer of protection for law enforcement officers by complementing, not superseding or abolishing, the immunity provisions of the Act. *Perona v. Township of Mullica,* 270 *N.J.Super.* 19, 25, 636 *A*.2d 535 (App.Div.1994); *see also Fielder v. Stonack,* 141 *N.J.* 101, 118, 661 *A*.2d 231 (1995) (noting that immunity need not be confined to the Act, but rather could stem from another source such as a statute).

## II

Plaintiff further maintains that summary judgment was improperly granted to Pennsauken, Corney and Merchantville because the judge erroneously refused to apply the special relationship doctrine which, plaintiff claims, has been adopted in New Jersey and which, according to plaintiff, supersedes any immunities under the Act. Plaintiff asserts that he, Pennsauken and Corney had a "special relationship," as that term has been defined by case law, which was created in part by the Screening Act, *N.J.S.A.* 30:4–27.1 to –27.11.

Preliminarily, plaintiff maintains that the law of the case doctrine precluded the judge from granting summary judgment to Pennsauken and Corney because two judges had previously denied those defendants summary judgment. The two judges reasoned that because of the nature of the relationship between the police and Blunt, as a civilian mental health screener, immunity should not apply. We do not agree with plaintiff's position.

A trial judge has the inherent power to review, revise, reconsider and modify interlocutory orders at any time prior to the entry of final judgment. *C.P. v. Piscataway Township Bd. of Educ.,* 293 *N.J.Super.* 421, 431, 681 *A.*2d 105 (App.Div.1996). Denial of summary judgment preserves rather than resolves issues; therefore, later reconsideration of matters implicated in the motion, including the reasons in support of the denial, are not precluded. *A & P Sheet Metal Co. v. Edward Hansen, Inc.,* 140 *N.J.Super.* 566, 573–74, 357 *A.*2d 37 (Law Div.1976). While the conclusions reached by the earlier motion judges are entitled to full consideration and respect, the extent to which deference should be paid to those earlier expressed views is a matter for the court's discretion. *Id.* at 576, 357 *A.*2d 37; *Schuhalter v. Salerno,* 279 *N.J.Super.* 504, 508 n. 1, 653 *A.*2d 596 (App.Div.), *certif. denied,* 142 *N.J.* 454, 663 *A.*2d 1361 (1995). We do not believe the trial judge abused his discretion by granting summary judgment to Pennsauken and Corney. In any event, as we will discuss at length, we conclude that the earlier judges' rulings were errone-

ous, because even a special relationship does not abrogate the immunity provisions of the Act.

The special relationship doctrine, as defined by the California courts, arises where it is alleged that the police failed to protect members of the public from the harm caused by a third person. *Lopez v. City of San Diego,* 190 *Cal.App.*3d 678, 235 *Cal.Rptr.* 583, 585 (1987). "Generally, there is no legal 'duty,' and hence no liability for negligence, unless there is a special relationship between the police and either the victim or the third person which gives rise to a responsibility to control the third person's conduct." *Ibid.* In the usual situation, such a relationship will depend on representations or conduct by the police which causes the victim to detrimentally rely on the police to the extent that the risk of harm as the result of police negligence is something more than that to which the victim was already exposed. *Ibid.*

In *Lee v. Doe,* 232 N.J.Super. 569, 571–72, 557 *A.*2d 1045 (App.Div.1989) another panel of this court addressed the special relationship doctrine where plaintiff brought an action based on the failure of the responding police officers to either search and apprehend an individual who threatened the plaintiff or to secure the area in the vicinity of the plaintiff's house. Thereafter, plaintiff was shot and wounded by the individual after the police officers had left the scene. *Lee, supra,* 232 *N.J.Super.* at 571–72, 557 *A.*2d 1045. Discussion of the special relationship doctrine arose in the context of the court's analysis of whether the officers were immune from liability under *N.J.S.A.* 59:5–5 (failure to make an arrest). The *Lee* court concluded that cases interpreting the California statute corresponding to *N.J.S.A.* 59:5–4 (failure to provide police protection) and *N.J.S.A.* 59:5–5 provide for immunity except where the police engage in conduct which gives rise to a special relationship with the victim, such as where the police caused the victim to rely on them for protection or the police otherwise increased the risk of injury to the victim. *Id.* at 579–81, 557 *A.*2d 1045. Nonetheless, the officers were held to be immune from liability under *N.J.S.A.* 59:5–5, because there was no special

relationship between the plaintiff and the officers in light of the fact that the officers neither increased the plaintiff's risk of harm nor induced reliance on their protection. *Ibid.*

In marked contrast to the conclusion reached by the court in *Lee, supra*, the California Supreme Court, however, has stated: "[T]he question of the applicability of a statutory immunity does not even arise until it is determined that a defendant otherwise owes a duty of care to the plaintiff and thus would be liable in the absence of such immunity." *Davidson v. City of Westminster*, 32 *Cal.3d* 197, 185 *Cal.Rptr.* 252, 254, 649 *P.2d* 894, 896 (1982). Thus, in California, once the court concludes that there is no special relationship establishing a duty of care, the issue of statutory immunity need not be reached. *Id.* at 255, 649 *P.2d* at 897. Recently, a California case has discussed the distinction between duty and immunity:

> Applicant argues that governmental immunities do not apply if there is a "special relationship" between the parties giving rise to a duty of care. Applicant has confused the issues. Where the defendant owes no duty of care, no cause of action can be stated, and the issue of immunity is irrelevant. If, because of a special relationship, a duty of care may be found which otherwise would not exist—in other words, if the plaintiff has stated a cause of action—it is then incumbent upon the court to determine whether any immunity applies. *The existence of an alleged special relationship does not negate the applicability of immunity; rather, it simply defines whether there is a duty that has been breached.*
>
> [*Masters v. San Bernardino County Employees*, 32 *Cal.App.*4th 30, 37 *Cal. Rptr.*2d 860, 869 n. 10 (1995) (emphasis added).]

*See also Whitcombe v. County of Yolo*, 73 *Cal.App.*3d 698, 141 *Cal.Rptr.* 189, 192 (1977) (rejecting the assumption that if a special relationship is established, there is no need to consider immunity, and thereby rejecting the related assumption that the special relationship doctrine gives rise to governmental liability notwithstanding principles of immunity). Thus, the sole purpose of the special relationship rule is to have "a reasonable and proper limitation of the scope of a duty of care owed," 57 *Am.Jur.2d Municipal, County, School, and State Tort Liability* § 141 (1988), not to abrogate existing immunities.

New Jersey has taken a contrary approach under the Act. Duty is not a consideration and the initial determination is whether an

immunity applies and, if not, then whether liability should attach. *Report of the Attorney General's Task Force on Sovereign Immunity* (1972). In a footnote, *Lee, supra,* appropriately noted this distinction between the laws of the two states:

> There appears to be a difference between California and New Jersey regarding the approach to immunity problems. In New Jersey the approach is whether an immunity applies and if not, whether liability should attach. However, in California, "the applicability of a statutory immunity does not even arise until it is determined that a defendant otherwise owes a duty of care to the plaintiff and thus would be liable in the absence of such immunity."

> [232 *N.J.Super.* at 580 n. 7, 557 *A.*2d 1045 (citations omitted).]

However, while the *Lee* court noted this distinction, it did not apply it in its discussion. In our view, there is no need for a determination of the question of duty of care under the Act or for an analysis of whether a special relationship existed between the public entity or employee and the injured plaintiff because immunity under the Act clearly is applicable.

■ In addition, we question the applicability of the special relationship doctrine to case law in this state. It has been observed that because the Act is intended to be strictly construed to effectuate its purpose, courts should be cautious in sanctioning novel causes of action. *1972 Task Force Comment to N.J.S.A. 59:2–1;* Margolis and Novack, *supra, Comment* to *N.J.S.A.* 59:1–2. Immunity is the dominant consideration of the Act. *Rochinsky v. State, Dep't of Transp.,* 110 *N.J.* 399, 408, 541 *A.*2d 1029 (1988). Thus, when both liability and immunity appear to exist, immunity prevails. *Tice, supra,* 133 *N.J.* at 356, 627 *A.*2d 1090. Moreover, several jurisdictions have abandoned the rule creating the special duty standard because it has been found to create needless confusion of the law and to produce uneven and inequitable results in practice. 57 *Am.Jur.2d, supra,* at § 144.

■ In summary, because establishment of a special relationship does not negate the immunities contained in the Act, we do not decide the question of whether a special relationship existed between the police and plaintiff. Plaintiff's claim that a special

relationship between the police and himself is irrelevant as immunity is clearly established.

## III

Plaintiff claims that defendants are not entitled to immunity under the Act because of willful misconduct. Plaintiff points to Merchantville's pursuit of Wirtz into Pennsauken and the refusal to take him into custody at that point, the alleged misrepresentation as to the existence of a warrant for Wirtz's arrest and the warrantless entry into Wirtz's boarding room. In addition, plaintiff maintains that defendants are not entitled to good faith immunity under the Act.

Pennsauken and Corney maintain that they did not commit willful misconduct because their acts were authorized by *N.J.S.A.* 30:4–27.6. They note that it was plaintiff's recommendation to enter Wirtz's room, and that the issue of good faith is moot both because of their entitlement to immunity under *N.J.S.A.* 59:5–2b and because plaintiff failed to raise the issue below. Merchantville contends that both *N.J.S.A.* 30:4–27.6 and "exigent circumstances" gave them the authority to pursue Wirtz, and that there can be no finding of willful misconduct because plaintiff fails to identify a policy or practice that the Merchantville police violated.

The alleged misrepresentation as to the existence of an outstanding warrant, rather than there being only summonses to compel Wirtz's appearance, does not in these circumstances support a cause of action. The officers proceeded under compulsion of the Screening Act which required that they take *immediate* custody of Wirtz based on their *personal observations* that there was "reasonable cause to believe that [he was a] person [ ] in need of involuntary commitment." *N.J.S.A.* 30:4–27.6a. It is clear that plaintiff was aware that this was the objective of all concerned at the time of the shooting.

In granting Pennsauken and Corney's summary judgment motion, the judge determined that "there is absolutely no evidence in the record before me upon which any jury could reasonably

determine that there was willful misconduct on the part of anyone." This determination is clearly supported by the record, and plaintiff's assertions in these regards are clearly without merit. All of the evidence demonstrates that the police acted in good faith throughout. Summary judgment was properly granted as to these allegations of the plaintiff. *Brill v. Guardian Life Ins. Co.,* 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995).

## IV

Plaintiff contends it was error to grant Merchantville summary judgment because discovery had not been completed and because the failure of the Borough's officers to take Wirtz into custody constituted the negligent performance of a ministerial act, which, under the Act, would expose Merchantville to liability. Merchantville maintains that summary judgment was not premature, but that any error caused by a premature grant of the motion was cured by plaintiff's motion for reconsideration. Merchantville also argues that it is immune from liability for any negligence on the part of its officers pursuant to *N.J.S.A.* 59:5–2b.

In granting Merchantville's summary judgment motion, the judge cited plaintiff's failure to submit an affidavit in accordance with *R.* 4:46–5, and the lack of evidence of the Borough's negligence. In denying plaintiff's motion for reconsideration, the judge found that plaintiff's expert's report constituted a net opinion and that the pursuit by Merchantville's police officers into Pennsauken was not a proximate cause of plaintiff's injuries.

We are convinced that even if discovery was not complete at the time the motion was decided, the issue was mooted by plaintiff's motion for reconsideration. By the time of the motion for reconsideration, plaintiff was able to offer a report from an expert who concluded that the Merchantville officers were negligent because they did not have the authority to pursue Wirtz into Pennsauken. Plaintiff points to no additional facts coming to light after Merchantville was granted summary judgment that would raise any additional factual or legal issues respecting liability.

The Merchantville police decision to refrain from taking Wirtz into custody until after he exhibited bizarre behavior is entitled to immunity as it was an operational discretionary decision, not a policy decision. *Perona, supra,* 270 *N.J.Super.* at 29, 636 *A.2d* 535. In any event, Merchantville is entitled to immunity under *N.J.S.A.* 59:5–2b(3) because Wirtz was clearly resisting arrest. Our Supreme Court has held that *N.J.S.A.* 59:5–2b immunizes both the employee and the entity "for *all* acts of negligence" relating to the injuries caused by an escaping person, whether discretionary or ministerial, whether an act or an omission. *Tice, supra,* 133 *N.J.* at 365, 367, 627 *A.2d* 1090. The policy consideration behind this immunity is the encouragement of diligent and aggressive law enforcement, undiminished by the detriment of tort liability. *Id.* at 365, 627 *A.2d* 1090.

## V

Lastly, we consider plaintiff's claim that the judge erred in granting summary judgment to Klapproth because she was negligent "in allowing her mentally ill grandson, Wirtz, to have access to the rifle," as she knew he was "unstable" and afraid of police, and because she allegedly breached a statutory duty under *N.J.S.A.* 2C:58–3(j) to dispose of her deceased husband's rifle. Plaintiff complains that the judge "failed to resolve factual issues in favor of plaintiff." Klapproth argues that there was no statutory violation, and that even if there was, the breach was not a proximate cause of plaintiff's injury in light of Wirtz's intervening criminal act.

In his deposition, Wirtz stated he stole the gun from the Klapproth's house a week or two after his January 11, 1990 encounter with the police. He knew his grandfather used to go hunting, but did not know where the gun was kept. Wirtz stayed in the vacant apartment above the Klapproth's garage one night, and unsuccessfully looked for the gun in the house and garage. The following day, Wirtz told his grandmother he was going to her basement to make a slingshot. As he was "rummag[ing]" through

the basement, he found the gun "up in the rafters." He put the gun down his pants, put on an overcoat, and left the house. He stated the gun was unloaded at the time and that it was hidden and he was "lucky" to come across it.

The record reveals that Klapproth's husband bought the .22 caliber rifle around 1965. He put the rifle in the rafters in the back of the basement for safekeeping approximately ten years prior to the shooting, and he died in 1982. No ammunition was kept in the basement. When asked if he was the only person who used the rifle, she stated: "I never touched the gun, I never knew a thing about it." Klapproth, now deceased, asserted "I could never have reached it in the rafters even if I wanted to move the thing." She was aware that her grandson had been in a psychiatric hospital and believed he was not quite "right in his mind." However, she never knew him to carry a weapon, and she said he was never "one for guns." In addition, she never heard Wirtz say that he intended to use a weapon to hurt anyone. According to Klapproth, Wirtz talked about the police, and his fear of the police, whenever he spoke to her. Klapproth was not aware that the gun was missing until after the shooting. She believed that Wirtz must have taken the gun on January 16, 1990, when he asked if he could go down to the cellar to get a tool. He did not have a key to her house and would not stay in her house, but rather in an apartment over the garage when visiting overnight.

▋ Whether a defendant owes a legal duty, and the scope of that duty, are questions of law for the court to decide. *Clohesy v. Food Circus Supermarkets, Inc.,* 149 *N.J.* 496, 502, 694 *A.*2d 1017 (1997). As our Supreme Court has stated:

> Whether a person owes a duty of reasonable care toward another turns on whether the imposition of such a duty satisfies an abiding sense of basic fairness under all of the circumstances in light of considerations of public policy. That inquiry involves identifying, weighing, and balancing several factors—the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution. The analysis is both very fact-specific and principled; it must lead to solutions that properly and fairly resolve the specific case and generate intelligible and sensible rules to govern future conduct.

[*Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 439, 625 *A.2d* 1110 (1993) (citations omitted).]

Foreseeability of harm is the crucial factor in determining whether a duty exists to take reasonable measures to guard against the criminal activity of others. *McGlynn v. Newark Parking Auth.,* 86 *N.J.* 551, 560, 432 *A.2d* 99 (1981). Thus, "[a]n act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal." *Restatement (Second) of Torts* § 302B (1965). As a comment to this section makes clear:

[T]hese situations arise where the actor is under a special responsibility toward the one who suffers the harm, which includes the duty to protect him against such intentional misconduct; or where the actor's own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such misconduct, which a reasonable man would take into account.

[*Id.* at cmt. e.]

The question of whether a party is liable when a weapon he or she owns is stolen from a private residence and subsequently used in a criminal act has not been decided in this State. However, other states have considered the issue.

In *Estate of Strever v. Cline,* 278 *Mont.* 165, 924 *P.2d* 666, 668 (1996), a pistol and ammunition were stolen from a bag underneath the seat of an unlocked pickup truck by three youths. One of the youths, who was "high" on marijuana, caused a bullet from the gun to strike another youth and kill him. *Ibid.* The youth's estate brought an action against the vehicle owner for the death. *Ibid.* The court held that the vehicle owner owed a duty to the decedent to store the firearm in a safe and prudent manner. *Id.* 924 *P.2d* at 669, 671. However, the court went on to hold that the owner's breach of duty was not a proximate cause of the loss because of the intervening criminal and grossly negligent acts of the youths. *Id.* 924 *P.2d* at 674. In *Valentine v. On Target, Inc.,* 112 *Md.App.* 679, 686 *A.2d* 636, 639–41 (1996), *cert. granted,* 344 *Md.* 719, 690 *A.2d* 525 (1997), a gun dealer was found to have no duty to a member of the general public killed by a gun stolen from

the dealer in the absence of a statute creating such a duty, a special relationship between the dealer and the victim, or a lack of due care in storing the weapon. In *Pavlides v. Niles Gun Show, Inc.*, 93 *Ohio App.*3d 46, 637 *N.E.*2d 404, 409 (1994), a gun show operator was held to owe to the general public the duty of preventing unsupervised entrance by minors into a gun show where unsecured firearms were displayed, as the operator knew that firearms had been stolen from previous gun shows.

In the present case, we agree with the motion judge that plaintiff has failed to establish that Klapproth breached a duty to plaintiff. There is no evidence that Klapproth ever assumed or exercised any control over the weapon. Merely because she would have been entitled to ownership and control of the rifle does not mean that she had a duty to locate her deceased husband's well-hidden rifle and make it further inaccessible to third parties who might clandestinely seek to steal it. There is no indication that stowing the rifle any other place upon the premises would have prevented its theft or the intentional shooting in question.

*Palmisano v. Ehrig*, 171 *N.J.Super.* 310, 408 *A.*2d 1083 (App. Div.1979), *certif. denied*, 82 *N.J.* 287, 412 *A.*2d 793 (1980), cited by plaintiff, is distinguishable. There, plaintiffs alleged the defendants negligently stored firearms in their first-floor apartment, one of which discharged and caused injury to an occupant of the second-floor apartment. *Id.* at 312, 408 *A.*2d 1083. The incident occurred when a friend of the defendants' son, who was staying in the apartment while defendants were on vacation, dropped a .22–caliber rifle that discharged. *Ibid.* The gun and ammunition were not locked away. *Ibid.* In reversing the trial court's grant of summary judgment to the defendants, we held that the trial court erroneously assumed that in order to find in favor of the plaintiffs, a jury would have to find that it was foreseeable that someone would enter the house and cause one of the guns to discharge. *Id.* at 313, 408 *A.*2d 1083. We noted that firearms have been held to be inherently dangerous instrumentalities imposing an extraordinary duty of care on one who possesses them, including a duty to

take such steps as will protect an innocent person from the "expectable" action of other persons. *Ibid.* There are clear legal and factual differences between *Palmisano* and this case. Here the intervening theft and subsequent intentional shooting were not foreseeable, while *Palmisano* involved an intervening "expectable" negligent act, as the rifle and ammunition were stored together and were readily available to the young persons.

With respect to the question of an intervening criminal act, such as occurred in this case, the *Restatement (Second) of Torts, supra,* at § 448 states:

The act of a third person in committing an intentional tort or crime is a *superseding* cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, *unless* the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime.

[Emphasis added.]

Under this rule, the actor must realize there is a likelihood that the failure to act would create an invitation or temptation which would be likely to lead to the commission of the crime, either because the invitation or temptation is such that a "recognizable percentage of humanity is likely to yield" or is created at a place where "persons of particularly vicious type are likely to be" and likely to lead to the commission of fairly definite types of crime. *Id.* at cmts. b and c. It would not be reasonable on the facts presented to conclude that Klapproth should have realized that the hidden rifle presented a circumstance that was likely to cause her grandson to search for, find and use the rifle to intentionally shoot another. We find no breach of a common law duty by Klapproth.

We next consider whether Klapproth breached a statutory duty to plaintiff under *N.J.S.A.* 2C:58–3(j), entitled "Firearms passing to heirs or legatees." This statute provides:

Notwithstanding any other provision of this section concerning the transfer, receipt or acquisition of a firearm, a permit to purchase or a firearms purchaser identification card shall not be required for the passing of a firearm upon the death of an owner thereof to his heir or legatee, whether the same be by testamentary bequest or by the laws of intestacy. The person who shall so receive, or acquire said

> firearm shall, however, be subject to all other provisions of this chapter. If the heir or legatee of such firearm does not qualify to possess or carry it, he may retain ownership of the firearm for the purpose of sale for a period not exceeding 180 days, or for such further limited period as may be approved by the chief law enforcement officer of the municipality in which the heir or legatee resides or the superintendent, provided that such firearm is in the custody of the chief law enforcement officer of the municipality or the superintendent during such period.
>
> [*Ibid.*]

Thus, *N.J.S.A.* 2C:58–3(j) allows a person to possess an inherited firearm without obtaining a firearms purchaser identification card, provided that if the person does not qualify to possess or carry it, the firearm can be retained for a limited time only for the purpose of disposing it. *See State v. Cunningham,* 186 *N.J.Super.* 502, 509, 453 *A.*2d 239 (App.Div.1982). For purposes of this argument, we will assume, without so holding, that the statute contemplates that although persons who become heirs to the weapon need not obtain an identification card prior to receipt of the firearm, they must thereafter obtain an identification card to maintain possession of the firearm. This would require Klapproth to comply with the other requirements attendant to receipt of an identification card, including *N.J.S.A.* 2C:58–3(b), which provides:

> No person shall ... receive ... a rifle or shotgun ... unless the ... assignee, donee, receiver or holder signs a written certification, on a form prescribed by the superintendent, which shall indicate that he presently complies with the requirements of subsection c. of this section.... The said certification ... in the case of a person who is not a dealer, ... may be filed with the chief of police of the municipality in which he resides or with the superintendent.

In turn, the chief of police or superintendent is authorized to issue to a qualified person a firearms purchaser identification card. *N.J.S.A.* 2C:58–3(d). Thus, for purposes of this discussion, we will assume that Klapproth violated *N.J.S.A.* 2C:58–3(j).

Nonetheless, the determination that a party has violated a statutory duty is not conclusive on the issue of negligence, unless it incorporated a common law duty of care, which the statute in question does not. *Giantonnio v. Taccard,* 291 *N.J.Super.* 31, 45, 676 *A.*2d 1110 (App.Div.1996). Rather, it is a circumstance which the jury should consider in assessing liability. *Ibid.* Breach of a legislated standard of conduct may be regarded as

evidence of negligence if the plaintiff is a member of the class for whose benefit the standard was established, the standard is germane to the type of hazard involved in the defendant's asserted duty, and the breach is shown to have been the efficient cause of the injury upon which the action is based. *Williamson v. Waldman,* 291 *N.J.Super.* 600, 607, 677 *A.*2d 1179 (App.Div.1996), *modified on other grounds,* 150 *N.J.* 232, 696 *A.*2d 14 (1997).

Chapter 58 has been construed as an effort to limit the availability of weapons so that guns will be kept out of the hands of all dangerously unfit persons. *Hoffman v. Union County Prosecutor,* 240 *N.J.Super.* 206, 214, 572 *A.*2d 1200 (Law Div.1990); Cannel, *Criminal Code Annotated,* comment 2 to *N.J.S.A.* 2C:58-1 (Gann 1997-98 ed.). Disqualifications are listed in the statute for this purpose. *N.J.S.A.* 2C:58-3(c). The class for whose benefit such legislation was enacted is the general public. As a result, it is reasonable to conclude that plaintiff was among those intended to be protected by the registration requirement of the statute.

"[I]n the absence of any other guide, a statute may well be assumed to include all risks that reasonably may be anticipated as likely to follow from its violation." *Prosser & Keeton on Torts,* § 36 at 227 (5th ed.1984) (footnote omitted). Here, there is no evidence Klapproth did not "qualify to possess" the firearm under *N.J.S.A.* 2C:58-3(c). Rather, any statutory violation was because she did not comply with the "provisions of th[e] chapter" regarding submission of the written certification.

Even if Klapproth had submitted the certification to obtain a firearms purchaser identification card, that would not have prevented Wirtz from taking the weapon from her residence and using it against plaintiff. "The test is reasonable foreseeability not possibility or conceivability." *Berko v. Freda,* 172 *N.J.Super.* 436, 439, 412 *A.*2d 821 (Law Div.1980), *aff'd,* 182 *N.J.Super.* 396, 442 *A.*2d 208 (App.Div.1982), *aff'd,* 93 *N.J.* 81, 459 *A.*2d 663 (1983). It cannot reasonably be concluded that Klapproth's failure to file a certificate, which took place several years before the incident in question, contributed in any way to the likelihood that Wirtz would

commit a crime while using the weapon. *See Romero v. National Rifle Ass'n of Am., Inc.,* 749 *F.*2d 77, 78, 82 (D.C.Cir.1984) (holding that employee's violation of a statute requiring that firearms be registered did not warrant a jury charge that the statutory violation was either *per se* negligence or even evidence of negligence, as the purpose of the registration requirement is not the prevention of criminal acts with stolen firearms).

The grants of summary judgment to respondents were in all respects proper. In light of our decision, the cross-claims are dismissed as moot.

Affirmed.