**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4767-18T2

ANTHONY WISSEH, AS A
MEMBER and TREASURER OF
THE PRESBYTERIAN CHURCH
OF NEWARK, THE PRESBYTERY
 OF NEWARK OF PRESBYTERIAN
CHURCH (USA) and THE
ADMINISTRATIVE COMMISSION
OF THE FIRST PRESBYTERIAN
CHURCH OF NEWARK,

       Plaintiffs-Appellants,

v.

ANA AQUINO, CATHERINE
CAMPBELL-WRIGHT, EMILE DUHO,
STEPHEN FINGAL, SR., SAMUEL
JAN, MICHAEL J. LUNGA and
PAUL TAYLOR,

       Defendants-Respondents.

_____

       Argued November 17, 2020 – Decided December 9, 2020

       Before Judges Yannotti, Haas and Mawla.

On appeal from the Superior Court of New Jersey, Law Division and Chancery Division, Essex County, Docket Nos. L-2647-17 and C-000147-18.

Ellen O'Connell argued the cause for appellants (Inglesino, Webster, Wyciskala & Taylor, LLC, attorneys; Ellen O'Connell, of counsel and on the briefs; Owen T. Weaver, on the briefs).

Charles Z. Schalk argued the cause for respondents (Savo, Schalk, Gillespie, O'Grodnick & Fisher, PA, attorneys; Charles Z. Schalk, of counsel and on the brief).

PER CURIAM

This appeal involves a dispute over control of the property of the First Presbyterian Church of Newark (First Church) between First Church's Board of Trustees (Board or defendants) on the one hand, and the Presbytery of Newark (Presbytery) of the Presbyterian Church (USA) (PCUSA), its Administrative Commission (AC), and Anthony Wisseh, a member of First Church (plaintiffs), on the other. Following a multi-day bench trial, the trial court found in favor of defendants and held that control of the property lay with the Board under a Royal Charter (the Charter) granted to First Church by King George II in 1753.

As they unsuccessfully did before the trial court, plaintiffs argue on appeal that the Charter is subject to N.J.S.A. 16:1-1 to -47 (Title 16), covering religious corporations, and more specifically N.J.S.A. 16:11-1 to -24 (Chapter 11),

covering the Presbyterian Church, and that these provisions give plaintiffs control of First Church's property. Plaintiffs also assert that the trial court violated the First Amendment by improperly entangling civil law with religion in making its decision and should have ruled that a certificate of incorporation filed by defendants in 2015 was invalid. Finally, plaintiffs argue that the court should have granted their motion for summary judgment instead of setting the matter down for trial.

Having considered plaintiffs' contentions in light of the record and the applicable law, we affirm.

I.

On April 11, 2017, plaintiffs, Anthony Wisseh, a First Church member and treasurer, and the Presbytery and its AC, filed a complaint in the Law Division against defendants for a declaratory judgment. Plaintiffs sought a declaration that the Charter had been amended by Chapter 11, N.J.S.A. 16:11-1 to -24, and that the 2015 certificate of incorporation violated New Jersey law. After defendants filed an answer, the parties thereafter filed cross-motions for summary judgment.

On August 14, 2018, the motion judge signed an order denying the parties' summary judgment motions because there were material issues of fact in

dispute, including the duties and responsibilities of the trustees under the Charter. In addition, the judge ordered the matter transferred to the Chancery Division because she found that the issues were primarily equitable rather than legal. The judge denied plaintiffs' motion for reconsideration on September 14, 2018.

II.

In the Chancery Division, the case was reassigned to Judge Jodi Lee Alper, who conducted a trial on eleven non-consecutive days between March and May 2019. The trial established the following facts.

First Church's history dates to 1644, when a congregational church was formed in Connecticut. The church moved to Newark in 1666 and reorganized as the First Presbyterian Church of Newark. The current church building was completed in 1792 and has attained landmark status.

On June 7, 1753, a Royal Charter was given to First Church by King George II incorporating a board of seven trustees and their successors as a body politic. Specifically, the Charter provided that seven individuals

> and their Successors forever hereafter shall be &
> remain one body Politick and Corporate in Deed, Fact,
> and Name, by the Name of the Trustees of the First
> Presbyterian Church in Newark . . . . And by that Name
> they shall & may have perpetual Succession, [a]nd . . .
> be and forever hereafter shall be Persons able in Law to

A-4767-18T2

purchase, take, hold, receive, and enjoy any Messuages, Houses, Lands, Tenements, Rents, Possessions, and other Hereditaments, & Real Estate, in Fee Simple or otherwise . . . . And also that they & their Successors . . . shall & may give, grant & demise, assign, sell or otherwise despose [sic] of all or any of their Messuages, Houses, Buildings, Lands, Tenements, Rents, Possessions, and other Hereditaments, & Real Estate, and all their Goods, Chattels, & other Things aforesaid as to them shall seem meet . . . .

The Charter required that the Church's money and assets be used to "erect & repair [p]ublic [b]uildings for the [w]orship of God [and] the [u]se of the [m]inistry and [s]chool, [h]ouses & Alms [h]ouses and suitably to support the [m]inistry . . . and to do & perform other [a]cts of [p]iety & [c]harity." The trustees were given perpetual succession, and were authorized to manage, lease, and sell property. The Charter did not require the trustees to obtain a Presbytery's permission to engage in such transactions and did not limit the number of terms of a member of the Board.

The Presbyterian denomination is a hierarchical church. Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church, 393 U.S. 440, 446 n.5 (1969). It consists, in descending order, of a General Assembly, a Synod, a Presbytery and the individual congregation, represented by a Session. The Session is a group of seven "elders" elected by the congregation which constitutes the governing body of the church. The

5

Presbytery of Newark, of which First Church was a member, covered Essex County. A Presbytery has authority over the Sessions and congregations that fall within its geographical region, including compliance with the General Assembly's Book of Order. The Synod covered the northeast, including New England, New York, and New Jersey, and has authority over the Presbyteries. The General Assembly covered the entire country and has authority over the Synods and Presbyteries. The PCUSA is considered the General Assembly.

Reverend Stephen Phelps, a Presbyterian Minister, testified on behalf of plaintiffs that the Constitution of the PCUSA has two elements: a Book of Order and a Book of Confessions. The Book of Order, which dates back to the 18th Century, sets forth guidance as to how to rule in matters pertaining to governance, worship, discipline, and theology. Under the Book of Order, each church is encouraged to form a corporation for the handling of assets for the benefit of the church's mission. According to the Book of Order, all property held by a congregation is held in trust for the use and benefit of the PCUSA. Phelps stated that when property is held contrary to the mission of the PCUSA, it can become the property of the supervising Presbytery. Moreover, the Book of Order requires the Sessions to seek Presbytery approval of any real estate transactions, including leases and sales.

A-4767-18T2

As to real property, the Book of Order provides:

> The provisions of this Constitution prescribing the manner in which decisions are made, reviewed, and corrected within this church are applicable to all matters pertaining to property.
>
> All property held by or for a congregation, a presbytery, a synod, the General Assembly, or the Presbyterian Church (U.S.A.) . . . is held in trust nevertheless for the use and benefit of the Presbyterian Church (U.S.A.).
>
> . . . .
>
> A congregation shall not sell, mortgage or otherwise encumber any of its real property and it shall not acquire real property subject to an encumbrance or condition without the written permission of the presbytery transmitted through the [S]ession of the congregation.
>
> A congregation shall not lease its real property used for purposes of worship, or lease for more than five years any of its other real property, without the written permission of the presbytery transmitted through the [S]ession of the congregation.
>
> [(Subsection headings omitted).]

According to Phelps, the first Presbytery on the eastern seaboard was formed in 1706. First Church joined in 1725. The PCUSA was formed in 1983, as a result of a merger between the United Presbyterian Church and the Presbyterian Church in the United States.

A-4767-18T2

Defendant Michael Lunga, a member of First Church's Board of Trustees, testified that the Board managed the Church's investments and expenditures to make sure that the funds were being used appropriately and in the best interests of the congregation. Lunga testified that the Church's total assets at the time of trial totaled about $20 million.

The trustees entered into a thirty-year lease with Devils Broad Street LLC in 2007 for the construction of the Prudential Center Arena and a parking garage. In conjunction with this transaction, the trustees engaged in a land swap with the City of Newark. The deal was not presented to the Presbytery or the PCUSA for approval. Lunga testified that neither of those entities had ever been involved with approving any of the Church's financial transactions.

According to Lunga, the Church's real estate transactions "have always been within the purview of the trustees and the trustees alone." He added that during the course of First Church's history, neither the Newark Presbytery, the Synod, the PCUSA, or its predecessors, had been involved with nor approved any real estate transactions. Rather, the trustees had the sole and exclusive power to deal with the real property and financial assets of First Church without obtaining approval from any other entity. This power included the leasing of church property.

8

Lunga also testified regarding other real estate transactions the Church had undertaken between 1936 and 2000. The Newark Presbytery, the Synod, and the PCUSA and its predecessors were not involved in any of the transactions. In addition, he testified that an "overture" handed down by the General Assembly in 1946 that a church may not sell or mortgage property without the permission of the local presbytery was contrary to both the Charter and First Church's practice, and thus was rejected at that time. According to Lunga, the Board always remained in full control of all First Church property, and it rebuffed similar efforts by the Synod in 1953 and by the General Assembly in 1980. Lunga further asserted that the Board had never followed the Book of Order with regard to its directives on property interests.

Lunga testified the Board of Trustees controls all the financial aspects of First Church, including investments and property, while the Presbytery, Synod, and Assembly are involved only in the ecclesiastical aspects of the church. Lunga believed that plaintiffs were seeking to gain control of First Church's property because the Presbytery was having financial difficulties.

Defendant Paul Taylor testified that he was a trustee for fifteen years. He stated that neither the Presbytery, the Synod, nor the PCUSA had any authority over First Church's property and financial affairs during the time he was on the

9

Board. In addition, the Board always followed the Charter, and not the Book of Order when it came to those matters.

In November 2012, the Board hired Glen Misick to be pastor. His employment agreement, signed by a representative of the Presbytery, stated: "At all times all parties shall strive to fulfill all of their respective obligations and duties in accordance with the Book of Order of the [PCUSA] to the extent that such do not conflict with the Charter of First Presbyterian Church of Newark or its historic traditions and precedents." Jeanette Oliver, who served as both deacon and trustee at the Church, testified that the Presbytery assisted in the hiring of the Church's minister.

According to Lunga, at Misick's insistence, the Board drafted a certificate of incorporation in 2015. The certificate stated that its purpose was to reaffirm the Church's corporate status dating back to the Charter granted by King George II. The Charter itself was incorporated by reference and appended to the certificate. The certificate further noted that in 1786, incorporated religious societies were given the right to file certificates of incorporation with the applicable county. However, "[t]he book where such certificate should appear in the Essex County Clerk's office is not to be found." Thus, the 2015 certificate stated:

> While the Trustees have no question of the existence of the corporate entity since the Charter . . . it is deemed prudent, although not totally necessary, to reaffirm said corporate status dating back to the original Charter . . . .

Lunga described the certificate as a reincorporation to ensure that the formalities of incorporation were met and could withstand any challenge to First Church's corporate status, in addition to reaffirming the Charter. He claimed that the church's incorporation had never been challenged. The certificate also reaffirmed and ratified all contracts, deeds, leases, and other actions taken by the Board of Trustees from the date of the Charter to the present. The trustees were given the sole power to adopt and amend any bylaws. This was contrary to the Book of Order, which gave that authority to the congregation.

Misick resigned as pastor in mid-2016. Lunga claimed that Misick believed that the provisions of the Charter did not apply to First Church and that he had never attended meetings of the Board. The Board refused to pay Misick a severance salary of approximately $55,000 that he requested with PCUSA's approval. Lunga testified that the Board refused to do so because, among other things, there had never been a policy to pay a pastor severance.

A report written for First Church by attorney Irving Riker (the Riker Report) in 1967 was also introduced into evidence. The report relied on a book,

11

Walter S. Nichols, The Old Town Endowment (1916), that stated that First Church "has long claimed the right of independent action with respect to its own properties," and that it would be "a grave mistake to allow external bodies with which it may be ecclesiastically associated to have any voice or control over the disposition of its funds."[1]

## III.

Following the trial, Judge Alper rendered a comprehensive oral decision in which she framed the issue as whether First Church was "bound by the umbrella of the [PCUSA] and the Book of Order, or whether it is an independent congregation by virtue of the Royal Charter and is a corporation which controls its own assets and property."  In finding the latter, Judge Alper stated:

> The [c]ourt finds that the Royal Charter of 1753 which created the Board of Trustees of the First Presbyterian Church in Newark is an enforceable contract between the private parties.  Pursuant to the Royal Charter, the Board of Trustees has the ongoing right to give, assign, or sell any of the lands, property, real estate, and goods of the Church as [it] deem[s] fit.

---

[1] In June 2015, the Presbytery appointed an AC headed by Phelps to investigate alleged improprieties by the Board.  In January 2019, the AC eventually established a new board of trustees for First Church in a process that Lunga described as "basically . . . an end-run around the lawsuit."  However, plaintiffs did not seek to enforce this action in the present litigation, and they do not claim that the selection of a new board rendered this appeal moot.  Similarly, defendants do not ask that the AC's action be nullified as a violation of the Charter.  Therefore, we do not address it further in this opinion.

12

The judge found that First Church was created well before the formation of the national Presbyterian Church, and that the Board had controlled its property since 1753 without exception. The judge stated, "It received its property not through the national church, but rather through the Royal Charter which conditioned the properties['] conveyance upon the Board of Trustees controlling and governing the property" of First Church. Based on long-standing United States Supreme Court precedent, the judge found that the Charter qualified as a contract between private parties that the State was forbidden to impair.

In this regard, Judge Alper cited N.J.S.A. 16:1-28, which states that where religious societies hold their property under charters of incorporation granted by the government of Great Britain prior to the American Revolution, "any such real and personal property shall be vested in and held by the corporation that may have been created." The judge rejected plaintiffs' argument that Chapter 11, governing the incorporation and powers of Presbyterian congregations and the Presbytery, applied to this dispute because First Church had remained incorporated since 1753, and Chapter 11 only applied to unincorporated Presbyterian churches. Judge Alper also cited the May 2015 certificate of incorporation filed by the Board "reaffirm[ing] the corporate status of the

13

Trustees of the First Presbyterian Church in Newark," and reaffirming and ratifying all actions taken by the Board from the date of the Charter to the present time.

Examining the historical property transactions, the judge noted that none of the transactions required the permission of the Newark Presbytery. The judge also found that the written employment agreement entered into in 2012 between the Board and Misick was "[m]ost telling," because it specifically acknowledged that the employment must not conflict with the Charter. As noted above, the Presbytery consented to this provision.

In addition, Judge Alper found that "in every instance where the [PCUSA] did attempt to assert control over property and/or assets of First Presbyterian Church, they were promptly rebuffed." The judge cited the Board's rejection of the General Assembly's effort in 1980 to amend its constitution to provide that all church property was to be held in trust for the whole church. Furthermore, the judge found there was no evidence that First Church had ever followed the Book of Order's directives on property interests. Judge Alper also held that any association between First Church and the PCUSA was "purely ecclesiastical" and "confined chiefly to the maintenance of sound doctrine[,]" and that "[t]he

property rights and interest of the Church have, since its inception, belonged exclusively to the congregation."

In sum, Judge Alper held that plaintiffs had failed to prove by a preponderance of the evidence that they were entitled to a declaratory judgment as sought in their complaint. This appeal followed.

IV.

On appeal, plaintiffs argue that the trial judge erred in determining that the Charter was not subject to N.J.S.A. 16:11-1 to -24, and in interpreting applicable United States Supreme Court precedent to bar such application. We disagree.

In general, "[f]inal determinations made by the trial court sitting in a non-jury case are subject to a limited and well-established scope of review[.]" Seidman v. Clifton Sav. Bank, 205 N.J. 150, 169 (2011). "[W]e do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice[.]" In re Tr. Created By Agreement Dated Dec. 20, 1961, 194 N.J. 276, 284 (2008) (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)). The court's findings of fact are "binding on appeal when supported

by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998).

That said, we review rulings on pure questions of law de novo. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). However, findings that "may be regarded as mixed resolutions of law and fact" generally receive deference on appeal, with review "limited to determining whether there is sufficient credible evidence in the record to support these findings." P.T. & L. Constr. Co. v. State, Dep't of Transp., 108 N.J. 539, 560 (1987).

Applying these standards, we discern no basis for disturbing Judge Alper's reasoned determination that the Charter was the governing document in matters concerning First Church's property and assets. In so ruling, the judge properly relied upon Trs. of Dartmouth Coll. v. Woodward, 17 U.S. (4 Wheat.) 518, 624-32 (1819). In that case, King George III granted Dartmouth College a charter in 1769, which established its governing structure, including a board of trustees. Ibid. In 1816, the New Hampshire legislature attempted to alter the charter in order to reinstate Dartmouth's deposed president. Ibid. It placed the power to appoint members to the board of trustees in the hands of the governor and created a state board with power to veto the trustees' decisions. Ibid.

A-4767-18T2

The Supreme Court invalidated the law, holding that the charter qualified as a contract between private parties with which the legislature could not interfere under the United States Constitution's "impairment of contract" clause. Id. at 636-54. Although the present case does not involve an attempt by a governmental entity to change the terms of a Royal Charter, Woodward still strongly supports Judge Alper's conclusion that state laws, like Chapter 11, may not be used in derogation of the terms of such an instrument.

In this regard, Chapter 11 sets forth provisions for the incorporation and governance of Presbyterian congregations, as well as for the Presbytery, of organizations that were not already incorporated at the time of its enactment. See N.J.S.A. 16:11-1 (stating that "[a]ny Christian congregation . . . not having an incorporated board of trustees, may elect and incorporate a board of trustees . . . .") (emphasis added). As Judge Alper found, First Church has been incorporated since 1753 by virtue of the Charter. Therefore, Chapter 11 is not applicable to defendants.

In 1786, New Jersey passed a statute, L. 1786, c. 129, permitting an incorporated religious society to file a certificate of incorporation with the clerk of the county where it was located. In 1846, a statute was passed confirming the titles of such corporations. Nixon's Digest of the Laws of New Jersey, p.

687, Sec. 10.  As noted above, in its 2015 certificate, the Board stated that while it believed First Church had filed a certificate pursuant to the 1786 law, the Charter itself established First Church's incorporation.  Therefore, the Board's failure to find a certificate of incorporation in the county clerk's office did not mean that First Church had not been incorporated.  Plaintiffs offered no evidence to contradict these assertions.

Moreover, under N.J.S.A. 16:1-28, titled saving of rights under charters granted by Great Britain, Rev. 1877, p. 960 § 12, "[an] act to incorporate the trustees of religious societies," approved April 9, 1875, such charters were saved from repeal.  That law provided:

> Whereas some religious societies have held property under charters of incorporation, granted by the government of Great Britain, previous to the Revolution, and doubts may arise whether such estate, so held, will descend and vest in the corporation created under the laws of this state—therefore be it enacted, that all of the estate, real and personal, held in fee or otherwise, in consequence of any charter granted aforesaid, shall be vested and held by the corporation in and held by the corporation that may have been created in the place thereof, in consequence of the act passed the sixth day of March . . . seventeen hundred and eighty-six, or the supplement thereto, passed the twenty-fifth day of November . . . seventeen hundred and eighty-nine, although no transfer of such property shall have been made by the trustee incorporated by such charter, to the trustees of the corporation created

18

under the said laws, anything in such charter or in any law to the contrary notwithstanding.

[Rev. 1877, p. 960 § 12.]

Thus, Judge Alper did not err in finding that First Church has been incorporated since at least the 1870s and, as a result, is not subject to the provisions of Chapter 11.

Plaintiffs argue, primarily in their reply brief, that the 2015 certificate of incorporation filed by the trustees subjected First Church to Title 16. Specifically, they cite N.J.S.A. 16:1-25, which provides in pertinent part:

> No . . . trustees . . . of any incorporated church . . . shall divert the estate, property or revenue belonging thereto to any purpose other than the support and maintenance of the church . . . connected with the church or denomination to which the corporation belongs. The highest judicatory of any denomination from which the property is attempted to be diverted in violation hereof, may enforce this provision, but nothing herein contained shall prevent action being taken by members of the congregation or otherwise to enforce this provision.

See also Kelly v. McIntire, 123 N.J. Eq. 351, 361 (Ch. 1938) ("The principle seems to be firmly established that a congregation belonging to a religious denomination and subject to the constitution, faith and doctrines thereof, cannot use its property for a purpose other than that sanctioned by the denomination").

19

However, the issue here is not the purpose to which the property is being put, but whether First Church has the authority and power to dispose of such property. Thus, there is no conflict between the Charter and Title 16. As the 1967 Riker Report stated:

> Here the problem is one of control. There is no question of a diversion of property from its proper use. Nothing in the cases cited lends credence to the assertion that mere connection with the United Presbyterian Church in ecclesiastical matters constitutes a relinquishment of the right to deal independently in property matters essentially secular in nature.

Under these circumstances, we are satisfied that Judge Alper correctly concluded, based upon sufficient credible evidence presented at trial, that the Charter continues to apply to First Church. Therefore, the judge properly denied plaintiffs' request for a declaration that the Charter was amended by Chapter 11.

V.

Plaintiffs also contend that Judge Alper erred by examining First Church's polity and whether the congregation was independent of the PCUSA, thereby "entangling" church and state in violation of the First Amendment. Again, we disagree.

Under the First Amendment, civil courts are barred from deciding issues of religious doctrine or ecclesiastical polity. Elmora Hebrew Ctr. v. Fishman,

125 N.J. 404, 413 (1991). However, that prohibition does not apply to civil adjudication of purely secular legal questions. Ibid. Thus, courts can decide secular legal questions in cases involving some background issues of religious doctrine so long as they do not intrude into the determination of the doctrinal issues. Id. at 414. In those instances, courts must confine their adjudications to their proper civil sphere by accepting the authority of a recognized religious body in resolving a particular doctrinal legal question while applying neutral principles of law to determine disputed questions which do not implicate religious doctrine. Ibid.

In Jones v. Wolf, 443 U.S. 595, 597 (1979), the Court addressed the question of whether civil courts may address a dispute over the ownership of church property without becoming entangled in religious doctrine in violation of the First and Fourteenth Amendments. The case involved a dispute between factions of a local Presbyterian church. Id. at 597-98. Noting that the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes, the Court nonetheless held that application of "neutral principles of law" to resolve such disputes is permissible. Id. at 602-03. That method relies exclusively on secular, objective, and well-established concepts of trust and property law familiar to lawyers and judges, thereby

avoiding entanglement in questions of religious doctrine, polity, and practice. Id. at 603. However, in undertaking such an examination, the civil court must take special care to scrutinize the relevant documents in purely secular terms. Id. at 604. Thus, where the corporate charter incorporates religious concepts in the provisions relating to the ownership of property, if its interpretation would require the civil court to resolve a religious controversy, the court must leave resolution of that issue to the authoritative ecclesiastical body. Ibid.

Plaintiffs claim that Judge Alper improperly examined and relied upon the Book of Order in determining that the Charter gave defendants the right to control First Church's property. However, in rendering her ruling, the judge merely analyzed the provisions regarding disposition of church property. The judge did not delve into, nor decide, ecclesiastical questions. Moreover, the provisions that govern First Church's property are specifically set forth in the Charter, not in the Book of Order. Therefore, the judge's decision did not run afoul of the First Amendment.

## VI.

Plaintiffs next argue that the motion judge erred by denying their motion for summary judgment prior to the trial. This argument lacks merit.

A-4767-18T2

A motion for summary judgment should only be granted when, considering the competent evidence presented, viewed in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995). Summary judgment should be denied unless the moving party's right to judgment is so clear that there is no room for controversy. Akhtar v. JDN Props. at Florham Park, L.L.C., 439 N.J. Super. 391, 399 (App. Div. 2015).

Here, the motion judge denied both parties' summary judgment motions because she wanted to examine further "the duties and responsibilities entrusted to [defendants] since the 1753 Charter." In addition, the judge believed the matter was more properly addressed in the Chancery Division than the Law Division.

Plaintiffs assert there was no dispute as to any of the material facts, but the eleven-day trial that followed the motion judge's decision established that the facts were sharply contested by the parties. Under these circumstances, we discern no basis for disturbing the motion judge's decision to allow the matter to proceed to trial. See Blunt v. Klapproth, 309 N.J. Super. 493, 504 (App. Div. 1998) (noting that the denial of a motion for summary judgment decides nothing

23

and merely reserves the issue for future disposition). Therefore, we reject plaintiffs' contention on this point.

VII.

Finally, plaintiffs argue that the 2015 certificate of incorporation filed by the Board to memorialize that it had already been incorporated by the Charter should be voided because it was allegedly incorrectly filed under N.J.S.A. 16:1-2 rather than N.J.S.A. 16:11-2. This argument also lacks merit.

N.J.S.A. 16:1-2, dealing with the incorporation of religious societies or congregations, provides that the "trustees shall make a certificate . . . and shall transmit such certificate to the county clerk, who shall forthwith record the same . . . . Thereupon the trustees and their successors shall be a corporation by the name stated in the certificate."

N.J.S.A. 16:11-2, which covers the Presbyterian Church, states that the board of trustees

> shall make, sign and seal a certificate of incorporation as soon as possible after the first election, setting forth:
>
> a. The location of the usual place of meeting for public worship of the congregation;
>
> b. The names of the trustees elected at the first election and their respective terms of office; and

c. The name chosen by the congregation by which the board of trustees shall be known.

In addition, N.J.S.A. 16:1-3 provides that where the trustees of any religious society recorded their certification of incorporation with a county clerk, pursuant to certain nineteenth century laws, but have failed to file the certificate with the secretary of state, the corporation is authorized to file a certified copy of the certificate with the secretary of state. "[U]pon the filing of such certificate . . . the incorporation and all de facto acts done in pursuance thereof are hereby validated, ratified and confirmed." Ibid.

N.J.S.A. 16:11-2 requires that the certificate be acknowledged by each trustee "before such officer and in such manner as may be required by law for the acknowledgement of deeds of lands, a certificate of which acknowledgement shall be indorsed in writing on the certificate of incorporation by the officer taking the same." Then the certificate must be recorded with the applicable county clerk and filed and recorded with the State. Ibid.

Plaintiffs claim that the 2015 certificate was void because it was filed under Chapter 1 and not Chapter 11. However, they do not explain how the certificate violated Chapter 11. It is essential for a party on appeal to present an adequate legal argument. State v. Hild, 148 N.J. Super. 294, 296 (App. Div. 1977). Plaintiffs have not done so here. Even assuming defendants were

25

required to file under Chapter 11, and that plaintiffs' claim is that defendants did not acknowledge the certificate before the county recording office, in violation of N.J.S.A. 16:11-2, plaintiffs do not point to such evidence in the record. Therefore, we reject plaintiffs' unsupported contention on this point.

To the extent that any of plaintiffs' remaining contentions are not specifically addressed herein, we have concluded that they lack sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION